**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
10 Madison Avenue, Suite 402
Morristown, New Jersey 07960
(973) 656-1600 (Telephone)
(973)656-1611 (Facsimile)
Eric.Stuart@odnss.com
Attorneys for Defendant D.R. Horton, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------------

| | |
|---|---|
| NEW JERSEY REGIONAL COUNCIL OF CARPENTERS and BROOKSIDE CONSTRUCTION CORPORATION OF SEWELL, NEW JERSEY, individually and on behalf of a class,<br><br>Plaintiffs,<br><br>v.<br><br>D.R. HORTON, INC., TOSA CONSTRUCTION, INC./N.PAONE CONSTRUCTION INC.,<br><br>Defendants. | *Civil Action*<br><br>**NOTICE OF REMOVAL** |

------------------------------------------------------

**TO:   CHIEF JUDGE AND JUDGES OF**
**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**ON NOTICE TO:**

>        Albert G. Kroll, Esq.
>        KROLL HEINEMAN GIBLIN, LLC
>        Metro Corporate Campus I
>        99 Wood Avenue South, Suite 307
>        Iselin, New Jersey 08830
>        Attorneys for Plaintiffs
>        New Jersey Regional Council of Carpenters

Robert L. Saldutti, Esq.
SALDUTTI LAW, LLC
800 N. Kings Highway, Suite 300
Cherry Hill, New Jersey 08034
Attorneys for Plaintiff Brookside Construction

Benjamin Y. Kaufman, Esq.
MILBERG WEISS LLP
One Pennsylvania Plaza
New York, New York 10119
Attorneys for Plaintiffs

Tosa Construction Inc./N. Paone Construction, Inc.
3220 Bergey Road, Suite 100
Hatfield, PA 19440

Clerk, Superior Court of the State of New Jersey
Law Division, Middlesex County
Middlesex County Courthouse
56 Paterson Street
New Brunswick, New Jersey 08903-0964

Theodore J. Fetter, Acting Clerk
Superior Court of New Jersey
Hughes Justice Complex
CN-971
Trenton, New Jersey 08625

**HONORABLE JUDGES:**

Defendant D.R. Horton, Inc. (referred to hereinafter as "D.R. Horton") notices the removal of this action pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1446 to the United States District Court for the District of New Jersey, and as grounds therefore shows as follows:

## TIMELINESS OF REMOVAL

1.     On March 19, 2008, plaintiffs New Jersey Regional Council of Carpenters and Brookside Construction Corporation of Sewell, New Jersey ("plaintiffs"), filed a civil action against D.R. Horton, in the Superior Court of New Jersey, Law Division, Middlesex County, entitled *New Jersey Regional Council of Carpenters et al. v. D.R. Horton, Inc. et al.*, Docket No.

MID-L-2150-08 ("plaintiffs' state court action") in which they allege that D.R. Horton and other subcontractors wrongfully conspired to depress the wages paid to their employees by knowingly hiring a workforce comprised of a large number of undocumented workers for the express purpose of depressing wages, managing costs, and avoiding payment of benefits and taxes associated with lawful employment. The plaintiffs allege violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), the Immigration and Nationality Act, 8 U.S.C. § 1324(a), Wire Fraud, 18 U.S.C. § 1343, New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J.S.A. 2C:41-1 *et seq.* ("NJRICO") and the New Jersey Construction Industry Independent Contractor Act, N.J.S.A. 34:20 *et seq.*

2.     The first notice received by D.R. Horton of plaintiffs' state court action occurred on or about March 25, 2008 when a copy of the Complaint was obtained by D.R. Horton from the office of the Clerk of the Superior Court in Middlesex County. D.R. Horton has <u>not</u> been served with the Plaintiffs' Complaint as of this date. A copy of the Complaint is annexed hereto as Exhibit A, and this is the only pleading relating to this matter.

3.     Accordingly, pursuant to 28 U.S.C. § 1446(b), this Notice of Removal has been timely filed within 30 days after which D.R. Horton first received a copy of the Complaint in the state court action.

## VENUE

4.     The Superior Court of New Jersey, Law Division, Middlesex County, is located in the District of New Jersey. Therefore, venue for purposes of removal is proper because it is the district and division embracing the place where such action is pending. 28 U.S.C. § 1441(a).

## BASIS FOR REMOVAL

5.     This cause is a civil action within the meaning of the Acts of Congress relating to removal of causes.

6.     This action is properly removable under 28 U.S.C. §1441 and 28 U.S.C. §1446 because the United States District Court has original jurisdiction in this case under 28 U.S.C. § 1331, which provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

7.     Plaintiffs have alleged two counts under the Federal RICO Act, 18 U.S.C. § 1961 et seq. (See Plaintiffs' Complaint, Counts II and III).

8.     Plaintiffs have also alleged violations of the Immigration and Nationality Act, 8 U.S.C. § 1324(a) and Wire Fraud, 18 U.S.C. § 1343. (See Plaintiffs' Complaint, pps. 31, 34).

9.     Consequently, there is federal subject matter jurisdiction for purposes of jurisdiction conferred by 28 U.S.C. § 1331.

10.     As the state law claims against D.R. Horton arise from the same nucleus of facts as the Federal claims, the Court may hear the state law claims as supplemental under 28 U.S.C. § 1367(a).

## NON-SERVICE EXCEPTION TO UNANIMITY REQUIREMENT OF 28 U.S.C. §1446(a)

11.     28 U.S.C. § 1446 has been construed to require that when there is more than one defendant, all must join in the removal petition.  An exception to this rule arises when a non-resident defendant has not been served at the time the removing defendant files its petition for removal.  "In that situation the removal petition will be effective provided that it alleges that the defendants who did not join in it were not served in the state proceeding."  Lewis v. Rego Company, 757 F.2d. 66, 68 (3d Cir. 1985).

12.     According to the plaintiffs' Complaint, co-defendant Tosa Construction, Inc./N. Paone Construction Inc. ("Tosa") is "a Pennsylvania corporation registered at 3220 Bergey Road, Suite 100, Hatfield, Pennsylvania 19440." (Plaintiffs' Complaint, ¶10). Thus, Tosa is a non-resident defendant.

13.     On April 3, 2008, we were informed by an employee of the Superior Court of New Jersey, Law Division, Middlesex County, Civil Division Manager's Office, that a proof of service had not been filed indicating that co-defendant Tosa Construction/N. Paone Construction, Inc. has been served with the Complaint as of this date.  We were further informed that Tosa had not filed a responsive pleading in plaintiffs' state court action, and no other proceedings have transpired in that action.  Accordingly, upon information and belief, D.R. Horton's removal petition has been filed before Tosa has been served with plaintiffs' Complaint.

## CONCLUSION

14.     Because there is federal question subject matter jurisdiction for purposes of jurisdiction conferred by 28 U.S.C. § 1331, plaintiffs' state court action may be removed pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1446.

15.     D.R. Horton has not previously sought similar relief and there have been no other proceedings in the state court action.

16.     By removing the within action, D.R. Horton does not waive, or intend to waive, any defenses it might have including insufficiency of process, insufficiency of service of process and/or lack of personal jurisdiction, and reserves the right to assert all defenses herein.

17.     In accordance with 28 U.S.C. §1446(d), copies of this Notice of Removal have been served upon counsel for plaintiffs, co-defendant Tosa, and filed with the Clerk of the

Superior Court of New Jersey and the Clerk of the Superior Court in Middlesex County, New Jersey.

WHEREFORE, D.R. Horton respectfully requests that this Honorable Court take jurisdiction of this action and issue all necessary orders and process to remove said action from the Superior Court of New Jersey, Middlesex County to the United States District Court for the District of New Jersey.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Attorneys for Defendant
D.R. Horton, Inc.

By:   /s/Eric C. Stuart
Eric C. Stuart

Dated: April 3, 2008

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I, Eric J. Stuart, Esq., counsel for defendant D.R. Horton, Inc., certify that the matter in controversy is not the subject of any other action pending in any court nor any pending arbitration or administrative proceedings.

/s/Eric C. Stuart
Eric C. Stuart

April 3, 2008

## CERTIFICATION OF SERVICE

I hereby certify that on April 3, 2008 the foregoing Notice of Removal, Corporate Disclosure Statement and Civil Cover Sheet was electronically filed with the Court. I also certify that on April 3, 2008, a true and correct copy of the foregoing Notice of Removal was served via regular mail, postage pre-paid, upon:

Albert G. Kroll, Esq.
KROLL HEINEMAN GIBLIN, LLC
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Attorneys for Plaintiffs
New Jersey Regional Council of Carpenters

Robert L. Saldutti, Esq.
SALDUTTI LAW, LLC
800 N. Kings Highway, Suite 300
Cherry Hill, New Jersey 08034
Attorneys for Plaintiff Brookside Construction

Benjamin Y. Kaufman, Esq.
MILBERG WEISS LLP
One Pennsylvania Plaza
New York, New York 10119
Attorneys for Plaintiffs

Tosa Construction Inc./N. Paone Construction, Inc.
3220 Bergey Road, Suite 100
Hatfield, PA 19440

Clerk, Superior Court of the State of New Jersey
Law Division, Middlesex County
Middlesex County Courthouse
56 Paterson Street
New Brunswick, New Jersey 08903-0964

Theodore J. Fetter, Acting Clerk
Superior Court of New Jersey
Hughes Justice Complex
CN-971
Trenton, New Jersey 08625

_____/s/Eric C. Stuart_____
Eric C. Stuart

5018641.1 (PERSONAL)

# EXHIBIT A

Albert G. Kroll, Esq.
Vincent M. Giblin, Esq.
James M. Monica, Esq.
**KROLL HEINEMAN GIBLIN, LLC**
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Tel: (732) 491-2100
Fax: (732)491-2120
*Attorneys for Plaintiffs*

| | |
|---|---|
| NEW JERSEY REGIONAL COUNCIL ) | SUPERIOR COURT OF NEW JERSEY |
| OF CARPENTERS and BROOKSIDE ) | LAW DIVISION |
| CONSTRUCTION CORPORATION OF ) | COUNTY OF MIDDLESEX |
| SEWELL NEW JERSEY, individually and ) | |
| on behalf of a class, ) | DOCKET NO.: MID-*L-2150-08* |
| ) | |
| Plaintiffs, ) | **CIVIL ACTION** |
| ) | |
| v. ) | |
| ) | |
| D.R. HORTON, INC., ) | **COMPLAINT** |
| TOSA CONSTRUCTION, INC./ ) | |
| N. PAONE CONSTRUCTION INC. ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiffs New Jersey Regional Council of Carpenters ("NJRCC"), individually and on

behalf of a Class, and Plaintiff Brookside Construction Corporation ("Brookside") individually

bring this action against defendant D.R. Horton, Inc. ("Horton"), and TOSA Inc./N. Paone

Construction Inc., ("Tosa").

## NATURE OF THE ACTION

1.      This is a class action brought under the federal and New Jersey Racketeer

Influenced and Corrupt Organizations ("RICO") acts, as well as the New Jersey Construction

Industry Independent Contractor Act. The members of the Class are current and former hourly

employees of Horton in New Jersey, including Horton's subcontractors' employees as well as

-1-


BC-HANG-18

members of the New Jersey Regional Council of Carpenters, whose wages have been depressed or who were unable to procure employment at Horton because of Horton and its subcontractors' employment of large numbers of undocumented workers (the "Class").  Plaintiffs seek injunctive and monetary relief on behalf of the Class.

2.      The Class has been victimized by a scheme perpetrated by Horton, which describes itself as "America's Builder", along with certain of its subcontractors, to depress the wages paid to its employees by knowingly hiring a workforce comprised of a large number of undocumented workers for the express purpose of depressing wages, managing costs, and avoiding payment of benefits and taxes associated with lawful employment (the "Illegal Hiring Scheme").  In addition, the Illegal Hiring Scheme has substantially and unlawfully increased the supply of workers from which Horton and its subcontractors make up its hourly workforce, which has permitted Horton and its subcontractors to depress the wages it pays to all of its hourly employees. Horton and its subcontractors perpetrate the Illegal Hiring Scheme through a network of contractors and subcontractors, including its own supervisors, who hire undocumented workers and perform additional services to facilitate their illegal employment by Horton and its subcontractors.   The Illegal Hiring Scheme is quite simple:  Horton hires regional or local subcontractors.  Those subcontractors then hire undocumented workers to staff job sites.  The subcontractors receive a check from Horton for work performed at the job site.    The undocumented workers are misclassified as independent contractors and are, upon information and belief, provided with IRS Forms 1099 instead of being classified as employees and being provided with IRS Forms W-2. The undocumented workers are then paid in cash with checks that the subcontractor cashes for them.

-2-

3.     By employing and harboring undocumented workers, Horton and its subcontractors are able to reduce labor costs by avoiding unemployment and workers compensation insurance, health and welfare benefits, applicable federal, state and local taxes, social security taxes, as well as depressing wages for its documented and undocumented hourly workers, and discouraging claims for workers compensation or the assertion of workers' other applicable legal rights. It has been estimated that costs to the state of New Jersey because of such conduct by Horton and others amount to hundreds of millions of dollars per year. Indeed, the State Legislature of New Jersey, in passing the Construction Industry Independent Contractor Act in 2007 recognized the insidiousness of such conduct, stating, "employers in the construction industry who improperly classify employees as independent contractors deprive these workers of proper Social Security benefits and other benefits, while reducing the employers' State and federal tax withholdings and related obligations. Moreover, this practice puts businesses that bear higher costs for complying with the law at a competitive disadvantage." N.J. Stat. § 34:20-2.

4.     In addition, Plaintiff Brookside brings this action individually for damages it sustained through Horton's conduct. As more fully described herein, Horton terminated Brookside and replaced Brookside with subcontractors who it knew or should have known employed undocumented workers. Brookside, in complying with federal and state labor and tax laws through its employment of legitimate union workers, was put at a competitive disadvantage by Horton and its subcontractors' Illegal Hiring Scheme.

5.     The conduct of Horton and its subcontractors' violates the federal RICO Act, 18 U.S.C. § 1961 *et seq.* ("federal RICO"), New Jersey's RICO Act, N.J.S.A. 2C:41-1 *et seq.* ("New Jersey RICO"), and New Jersey's Construction Industry Independent Contractor Act, N.J. Stat. § 34:20 *et seq.*, as more fully set forth below.

-3-

## PARTIES AND JURISDICTION

6.    Plaintiff NJRCC is comprised of 17,000 members, and is one of 50 regional units that form the United Brotherhood of Carpenters and Joiners of America ("UBC"). The UBC has more than 500,000 members across the U.S. and Canada, in every state and province. The NJRCC Headquarters is located in Edison, New Jersey in Middlesex County.

7.    Plaintiff Brookside performed "rough carpentry" at Horton's Plaza Grande at Garden State Park under a subcontract with J.J. Deluca ("Deluca"), who contracted directly with Horton.    Brookside performed such services until April 7, 2006, when Horton terminated Brookside and replaced it with Tosa, a non-union contractor. Brookside is located at 57 Stewart Avenue in Delran, New Jersey.

8.    Defendant Horton is a publicly held corporation organized under the laws of the state of Delaware with its principal place of business in Fort Worth, Texas.  Horton has operating divisions in 25 states and 74 metropolitan markets of the United States, including New Jersey. Horton's New Jersey projects include: The Plaza Grande at Garden State Park in Cherry Hill, New Jersey; The Village Grande at English Mill in Egg Harbor Township, New Jersey; The Village Grande at Camelot in Glassboro, New Jersey; The Grande at Springville in Mount Laurel, New Jersey; The Plaza Grande at Old Bridge in Old Bridge, New Jersey; The Grande at Riverdale, in Riverdale, New Jersey and The Grande at Burrs Mill in Southampton, New Jersey. Many of the aforementioned Horton New Jersey projects are featured prominently on Horton's website.

9.    Horton employs approximately 6,200 persons, with the major part of Horton's homebuilding operations in Arizona, California, Colorado, Florida, Nevada and Texas.

- 4 -

According to Horton's website, http://www.drhorton.com, "D.R. Horton, Inc., America's Builder, is the largest homebuilder in the United States, delivering more than 41,000 new homes in its fiscal year ended September 30, 2007." According to Horton's Annual Report for the fiscal year 2007, Horton's homebuilding revenues last year were $11.1 billion.

10.    Defendant TOSA Inc./N. Paone Construction Inc. ("Tosa") is a Pennsylvania corporation registered at 3220 Bergey Road, Suite 100, Hatfield, PA 19440 that performed subcontracting work as a subcontractor for Horton at Horton's Plaza Grande at Garden State Park, and, upon information and belief, is the parent company of wholly-owned subsidiary Sato, Inc., a Pennsylvania corporation which administered payroll for work performed at Horton's Plaza Grande at Garden State Park.

11.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with New Jersey so as to render the exercise of jurisdiction by the New Jersey courts permissible under traditional notions of fair play and substantial justice.  A substantial portion of the allegations complained of herein, including the defendants' participation in the wrongful acts detailed herein occurred in New Jersey.

12.    Venue is proper in this Court because Plaintiff NJRCC maintains its executive offices in this County.

## SUBSTANTIVE ALLEGATIONS

### A.    Horton's Illegal Hiring Scheme

13.    Horton employs many thousands of hourly workers in its operations in New Jersey and throughout the United States. In an effort to keep labor costs as low as possible, Horton and its subcontractors have engaged in the illegal hiring of persons who are not eligible for employment in the United States. Horton and its subcontractors have accepted for employment and continue to employ workers that they either directly or indirectly know or should have known were not, and are not, authorized to work in the United States.

14.    Undocumented workers, because of their impoverished economic state, their desperate need for employment and their illicit presence in this country, tend to work for wages significantly below what a labor market comprised of United States citizens or permanent residents would require, and without the significant protections afforded legal workers under applicable federal and state laws.

15.    Undocumented workers are further exploited in that they often accept deplorable workplace conditions and rarely file worker's compensation claims when injured on the job. Undocumented workers are not paid overtime and rarely file claims when afforded limited state and federal workplace protections. Undocumented workers also rarely complain about state and local tax fraud, lack of workplace protections, poor working conditions, and even failure to pay wages out of fear of reprisal and/or deportation.

16.    Horton, through its supervisors and construction superintendents, monitors its contractors' and subcontractors' work. Upon information and belief, Horton's regional and corporate offices are responsible for the review of personnel decisions. The corporate offices

departments are further responsible for establishing operational policies and internal control standards, and for monitoring compliance with such policies and controls. As part of Horton's Illegal Hiring Scheme, Horton transfers this responsibility to subcontractors, in an attempt to avoid liability and to shield itself from detection.

17.     Horton and its subcontractors, in their common practice, failed and are continuing to fail to even check any type of employment documentation and continue to adhere to this practice.  Horton and its subcontractors, in their common practice, misclassify undocumented workers as independent contractors and, upon information and belief, provide them with IRS Forms 1099 instead of properly classifying those workers as employees.

18.     Indeed, a high-level Horton employee has stated that Horton prefers hiring undocumented workers because those workers do not complain about working conditions and do not submit claims for workers' compensation. As a direct and proximate result of Horton and its subcontractors' employment and harboring of undocumented workers, Horton and its subcontractors have been able to save substantial sums of money in worker's compensation liability that they would have incurred had Horton and its subcontractors not violated the law. Likewise, the Illegal Hiring Scheme ultimately deprives the state and federal government of taxes, including social security contributions, contributions for workers compensation and contributions to unemployment insurance programs.

19.     Horton and its subcontractors' act of knowingly or recklessly hiring, encouraging, transporting and harboring undocumented workers has enabled Horton and its subcontractors to depress wages and thereby to pay all of their hourly workers, including members of the Class,

wages that are lower than they would be if Horton and its subcontractors did not engage in this illegal conduct.

20.     Moreover, one purpose and intended effect of Horton and its subcontractors' widespread hiring, encouraging, transporting and harboring of undocumented workers is to deprive Horton and its subcontractors' hourly workers of any individual or collective bargaining power.   Because Horton and its subcontractors know that many of their workers are not authorized to reside or work in the United States, Horton and its subcontractors know that those undocumented workers are beholden to Horton and its subcontractors.   Horton and its subcontractors are further aware that their undocumented workers have virtually no effective means or collective voice to complain about the terms and conditions of their employment.

21.     Horton and its subcontractors' hiring, encouraging, transporting and harboring of undocumented workers takes advantage of the undocumented workers' compromised situation and unfairly exploits these workers for their own purposes.

22.     As a direct and proximate result of the Illegal Hiring Scheme, members of the Class have both earned wages and received benefits below what they would have earned if Horton and its subcontractors had complied with the law, as well as lost opportunities for legal employment.   In addition, Brookside has suffered business injury as a direct and proximate result of the Illegal Hiring Scheme.

**B.      Horton Replacement of Union Contractors with Non-Union Contractors: the Illegal Hiring Scheme at Horton's Plaza Grande at Garden State Park**

23.      The Horton Plaza Grande at Garden State Park, when completed, will consist of 608 condominium homes for adults fifty-five years of age or older on a former thoroughbred and short track horse race track in Cherry Hill, New Jersey.

24.      Work began on Horton Plaza Grande at Garden State Park in or about January 2006. A member of the NJRCC, Confidential Witness 1 ("CW1"), attended a pre-job meeting that took place at the job office on the Horton's Plaza Grande at Garden State Park worksite. Al Garfall ("Garfall"), then Senior Vice President of the Delaware Valley Division of Horton and subsequently promoted to Division President, and Howard Schoor, a project developer for Horton, attended the meeting, as did personnel from organized labor building trades who were to work onsite, including NJRCC. At that meeting, Horton and its subcontractors agreed to use union labor on Horton's Plaza Grande at Garden State Park worksite, and expressed no reservations about working with the building trade unions or NJRCC.

25.      Beginning on or about March 13, 2006, J.J. Deluca, Inc. ("Deluca") served as the general contractor on Horton's Plaza Grande at Garden State Park worksite. Deluca in turn subcontracted carpentry work to be performed onsite to Brookside, a union contractor, from whom it had secured a payment and performance bond to ensure the commitment of Brookside to meet every performance obligation on the project. Approximately twenty-five members of the NJRCC undertook work for Horton and Brookside on Horton's Plaza Grande at Garden State Park worksite. Deluca served in this capacity until Horton itself assumed the general contractor function in June, 2006.

26.     As the first four buildings were constructed, members of NJRCC worked onsite for Brookside without incident and additional NJRCC members were added to the job by Brookside from time to time as work demand so dictated.

27.     On March 28, 2006, CW1 was called to another meeting that took place at the job office on the Horton's Plaza Grande at Garden State Park worksite. Business agents from the various building trade unions attended the meeting, along with Garfall and Gregory Galik, a Horton Senior Vice-President. At that meeting, Garfall for the first time complained about the jurisdiction coverage of the NJRCC, as the union maintained jurisdiction over general carpentry, as well as drywall and framing construction work.

28.     On April 7, 2006, after about 6 months into the job, Bill Marma ("Marma"), the Horton project manager of Horton's Plaza Grande at Garden State Park called CW1 into yet another meeting at the job site at the Horton's Plaza Grande at Garden State Park worksite trailer.

29.     When CW1 walked in, there were several Horton employees already present, including but not limited to Marma, Zack Coburn (a Horton senior project manager from Horton's Lancaster, Pennsylvania office), Anthony DiGregorio (a Horton assistant project manager), and Ted Kemo, (a Tosa superintendent). No one from Brookside was present at the meeting.

30.     At that meeting, Marma told CW1 that the union for the first time that they "did not man the job properly," that they performed "substandard work," and that their "men were too slow." CW1, knowing that the complaints were without merit and that they were a pretext to throwing the union off the site, vigorously rebutted the claims, by pointing out that the job was

manned as Horton dictated and that the site had passed all inspections. The atmosphere of the meeting became heated. At that point, Garfall arrived and repeated what Marma had just for the first time alleged about the union's work. CW1 again rebutted Garfall and Marma's allegations, and then implored the two men saying, "I don't know what you are trying to do." Garfall replied to CW1 that he was "trying to get rid of all the unions on the job site" and that he would "bring his own people in" who were "happy to work" and would work "sunup to sundown." Garfall also stated, "We've got plenty of lawyers and money, and we don't give a fuck about your little picket lines and blown-up rats." Garfall then told CW1 that Brookside was fired from the site, and from that point forward, workers would report not to Brookside, but to Tosa and the Horton representative, Ed Eckenroad.

31.     At this point, CW1 told Garfall that the NJRCC would require that fifty percent of the jobs onsite under Tosa be filled with union employees. Garfall countered and told CW1 that Horton and Tosa would hire only two NJRCC carpenter apprentices for the site. CW1 replied that the offer was unacceptable, at which time Garfall and CW1 went outside the job office trailer to speak.

32.     Once they were outside the trailer, Garfall told CW1 that there should be "no hard feelings" about the situation. Garfall then said CW1, "I don't like unions. ... my people pull together to get my jobs done fast. This is just the way we do business. Now, who do I have to write a check out to to make this all go away?"

33.     CW1 replied that they would both go to jail under such an arrangement, and he left the meeting and Horton's Plaza Grande at Garden State Park worksite.

34.    On information and belief, on April 7, 2006, Marma sent DeLuca Project Manager Marsha McClellan an email an informing Deluca that Horton was replacing Brookside with Tosa as the contract carpenter on Horton's Plaza Grande at Garden State Park.

35.    After Horton fired Brookside Construction as the framing subcontractor on Horton's Plaza Grande at Garden State Park, and made Tosa, a non-union contractor, the framing subcontractor on the project, Tosa in turn hired subcontractors to perform work on Horton's Plaza Grande at Garden State Park project.

36.    Upon information and belief, neither Deluca nor Brookside received advance notice or forewarning of Brookside's dismissal, nor were there any communications from Horton pointing to any real or perceived material deficiencies in Brookside's carpentry services.

37.    NJRCC decided to accept Horton's offer to have two NJRCC workers remain on Horton's Plaza Grande at Garden State Park worksite under Tosa. NJRCC acquiesced to the arrangement with the intention to place two NJRCC members as watchdog employees on the worksite.

38.    CW1 called Marma and informed him that NJRCC would accept Horton's offer to leave two NJRCC members at Horton's Plaza Grande at Garden State Park worksite, but that the two NJRCC members must consist of a "journeyman carpenter" and an "apprentice carpenter" under the NJRCC rules.   Marma accepted this arrangement, and Confidential Witness 2 ("CW2"), a journeyman carpenter who had already been working at Horton's Plaza Grande at Garden State Park worksite for Brookside, was assigned to perform work at Horton's Plaza Grande at Garden State Park worksite for Tosa, along with Confidential Witness 9 ("CW9"), an apprentice carpenter.

- 12 -

39.   CW2 had been working on Horton's Plaza Grande at Garden State Park worksite since April 6, 2006.  CW2 began working under the new arrangement on Horton's Plaza Grande at Garden State Park worksite on April 19, 2006. Under the new arrangement, CW2 was actually employed and paid by Sato, a Tosa affiliate, who, upon information and belief, was located at the same address as Tosa in Pennsylvania.  CW2's work on Horton's Plaza Grande at Garden State Park worksite was exemplary, and Steve Young ("Young"), a Tosa foreman, made CW2 a *de facto* crew supervisor within the first week of his employment under the new arrangement.

40.   CW2 is fluent in Portuguese and Spanish. He regularly lunched with and spoke to Tosa subcontractor crew workers onsite, gaining their friendship and trust. Several of the crew workers told CW2 that they were undocumented, or that they had recently come into the country illegally by crossing the Rio Grande river into the United States. They also told him that they were being paid $12-$15 per hour, and were not being paid for their overtime work.

41.   As a crew supervisor, CW2 observed firsthand that the crew hired by Tosa consisted mainly of undocumented unskilled labor. CW2 observed the Tosa subcontractor crew's improper installation of doors, use of improper materials, and generally poor construction work.

42.   Certain of the subcontractor crew workers that told CW2 that they were undocumented also told CW2 that they worked on other Horton job sites in Northern New Jersey, including Horton's "The Grande at Riverdale", in Riverdale, Morris County, New Jersey.

43.   On May 1, 2006, immigrant rights groups organized a national protest day called "A Day Without Immigrants," or "Un Dia Sin Inmigrantes." On this date, undocumented workers nationwide did not go to work in an effort to show the economic importance of undocumented workers to the United States. On that date, CW2 observed that the only people

-13-

who were performing construction work at Horton's Plaza Grande at Garden State Park worksite, were himself, Young, and CW9. No one besides CW2, Young, and CW9 from the day-to-day work crews at Horton's Plaza Grande at Garden State Park were even present at the Horton site that day.

44.     Confidential Witness 3 ("CW3"), a Horton supervisor on Horton's Plaza Grande at Garden State Park worksite who is no longer employed by Horton, observed cash payments to employees of Tosa subcontractors MM Carpentry and Rodriguez Drywall at the Tosa offices and on Horton's Plaza Grande at Garden State Park worksite.

45.     According to CW3, Tosa and its subcontractors, in their regular practice, provided undocumented workers on Horton's Plaza Grande at Garden State Park worksite with Forms 1099, even when they had knowledge that the workers were undocumented and were not independent contractors.

46.     CW2 and CW3 regularly observed passenger vans with out of state license plates from Pennsylvania and New York dropping off groups of workers for Horton subcontractor crews at Horton's Plaza Grande at Garden State Park worksite.

47.     On May 18, 2006, Young told CW2 that the foreman from DeLuca wanted to know the hours the Tosa subcontractor crew worked, and CW2 suggested to Young that the workers use sign-in sheets, as no system existed to track the subcontractor crew. Young agreed, and CW2 created sign-in sheets for the Tosa subcontractor workers to use, and took them to the subcontractor crew workers to sign, which they did, beginning on May 19, 2008. As alleged infra at Paragraphs 91 through 94, Horton supervisors reviewed the completed timesheets.

- 14 -

48.     On May 19, 2006, CW2 and CW9 spoke to three workers from Rodriguez Drywall, another Tosa subcontractor.   All three men told CW2 and CW9 that they were undocumented, and that Tosa subcontractor Rodriguez Drywall paid them $14 per hour in cash.

49.     On May 24, 2006, while workers from Tosa subcontractors MM Carpentry, Rodriguez Drywall and JDA Carpentry were working onsite at Building 100, a Horton quality control supervisor visited the site and Building 100, stopping to speak with CW2 and CW9.

50.     On May 26, 2006, Young asked CW2 and CW9 if they would perform overtime work on Saturday and not report it to their union, instead electing to receive payment from Tosa in cash.

51.     On May 30, 2006, CW2 and CW9 told Young that they would perform overtime work on Saturday and not report it to their union, instead electing to receive payment from Tosa in cash, so long as Young guaranteed to them that Horton was aware of the arrangement. Mr. Young replied that CW2 and CW9 should speak to the Horton supervisor onsite to get Horton's approval for the arrangement. On May 31, 2006, CW2 spoke to the Horton supervisor onsite and told him that Young had asked CW2 and CW9 told Young that they would perform overtime work on Saturday and not report it to their union, instead electing to receive payment from Tosa in cash. At that time, the Horton supervisor onsite told CW2 "If you guys don't tell, I won't tell."

52.     On June 1, 2006, Young told CW2 and CW9 that, in order to pay them cash for the overtime they were going to work, he would put both of them on the payroll for Tosa subcontractor Rodriguez Drywall and then he would "get cash for them."

53.     On June 3, 2006, the principal of Tosa subcontractor MM Carpentry called CW2 and told him that Tosa owed him $34,189 for his work on Horton's Plaza Grande at Garden State Park. The principal of Tosa subcontractor MM Carpentry also told CW2 that he had been waiting for more than three months for Tosa to pay him $5,209 for Tosa subcontractor MM Carpentry's work on Horton's "The Grande at Riverdale", another Horton project for which Tosa subcontractor MM Carpentry did work for Horton in Riverdale in Morris County, New Jersey.

54.     Tosa subcontractor MM Carpentry performed work as a subcontractor on Horton's "The Grande at Riverdale", another Horton project for which Tosa subcontractor MM Carpentry did work for Horton in Riverdale in Morris County, New Jersey. Upon information and belief, Tosa subcontractor SFL Contractors also performed work as a subcontractor on Horton's "The Grande at Riverdale".

55.     A June 5, 2006 invoice from Tosa to Horton billed Horton for carpentry labor performed on Horton's Plaza Grande at Garden State Park. The invoice shows that Tosa charged Horton a flat rate for each worker per hour, with no overtime compensation, even though the invoice clearly sets forth overtime hours worked by Tosa subcontractor crews.

56.     Horton's review of subcontractor invoices put Horton on notice that subcontractor crews were working overtime on June 15, 2006 at Horton's Plaza Grande at Garden State Park, even though Horton was not paying overtime compensation.

57.     On June 13, 2006, Deluca's foreman asked CW2 if he and CW9 worked on the previous Saturday. The foreman reminded CW2 that CW3 said that Horton would not and did not pay overtime.

58.    On June 15, 2006, Young instructed CW2 to add another name to the sign-in sheet, which Young told CW2 would be for a fictitious employee of the Tosa subcontractor crew. Young wanted to add a name for a fictitious employee to the Tosa subcontractor crew to charge additional labor costs to the Horton invoices. In order to flag the fact that the employee was a fictional "ghost laborer" on the sign-in sheets and timesheets for the invoices, CW2 gave the fictitious worker the name "Clavo Torto," which translates in English to "Crooked Nail." This fictitious worker appeared on invoices dated: June 16, 2006; June 17, 2006; June 20, 2006; June 21, 2006; June 22, 2006; June 26, 2006; June 28, 2006; July 3, 2006; July 6, 2006; and July 10, 2006.

59.    On June 19, 2006, Young paid CW2 $50 in cash for work he performed on the previous Saturday. Young had previously told CW2 that he would receive $200 for his work on that day. When CW2 complained to Young about the lower wage, Young agreed to give him another cash payment later on.

60.    On June 19, 2006, CW3 told CW2 and CW9 that he knew laborers had worked overtime at on Horton's Plaza Grande at Garden State Park worksite the previous Saturday.

61.    On June 20, 2006, Horton terminated Deluca as the general contactor on Horton's Plaza Grande at Garden State Park, and Horton itself assumed the role of general contractor on the project, thus becoming even further involved in real-time management and onsite activity at Horton's Plaza Grande at Garden State Park.

62.    On June 20, 2006, Young told CW2 and CW9 that he was bringing in "twenty really good Brazilian framers" to work on Horton's Plaza Grande at Garden State Park.

- 17 -

63.    On June 28, 2006, CW2 learned that Horton had fired DeLuca as a general contractor on Horton's Plaza Grande at Garden State Park, and that Horton itself had become general contractor on the site.

64.    Confidential Witnesses 4 and 5 ("CW4" and "CW5"), are undocumented workers who worked for Tosa subcontractor MM Carpentry at the Horton's Plaza Grande at Garden State Park worksite, and whose hours worked are reflected on timesheets for Horton's Plaza Grande at Garden State Park. They were hired in the Spring of 2006 by Tosa subcontractor MM Carpentry at Horton's Plaza Grande at Garden State Park worksite. As a condition of their employment with Tosa subcontractor MM Carpentry, these workers were to purchase their own tools and safety equipment, in violation of Occupational Safety and Health Administration rules that require an employer to provide personal protective equipment at no cost to the employee.

65.    According to CW4 and CW5, Tosa subcontractor MM Carpentry paid the undocumented workers a $16 per hour flat rate for their work as framers on the Horton worksite, far from the maximum $54 per hour union carpenter rate. CW4 and CW5, along with other undocumented workers hired by Tosa subcontractor MM Carpentry to work on Horton's Plaza Grande at Garden State Park worksite, labored nine to ten hours per day, six days per week at Horton's worksite, without overtime compensation, in violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. 201, *et seq.*, as well as the New Jersey Prevailing wage law, N.J.S.A. 34:11-56(a)(4), which requires contactors to pay regulated overtime rates to employees.

66.    On May 9, 2006, undocumented workers from Tosa subcontractor MM Carpentry told CW2 that they were being paid per week in cash. One undocumented worker told CW2 that he made $17 per hour and the rest of the MM crew made as little as $8 per hour. That

undocumented worker told CW2 that he paid $11,000 cash to come to the United States from Brazil by way of Mexico. He also told CW2 that he needed to pay another $10,000 cash to bring his wife to the United States from Brazil.

67.     Young acted as the first-line supervisor of the undocumented workers, first under general contractor Deluca and then under Horton once Horton assumed the general contractor role at Horton's Plaza Grande at Garden State Park. Young also oversaw the work of Tosa subcontractor MM Carpentry. According to CW2, CW4 and CW5, Young suggested that certain of the undocumented workers on that crew rent a home on Church Street in Cherry Hill, a few hundred yards from Horton's Plaza Grande at Garden State Park worksite. On June 21, 2006, Young took out cash from an ATM machine to give those workers $240 for a deposit on the rental. Young himself eventually resided with the undocumented workers rent-free at that residence.

68.     According to CW4 and CW5, Tosa subcontractor MM Carpentry was to pay its undocumented workers on the 15th and the 30th of each month at a rate of $16 per hour for work on Horton's Plaza Grande at Garden State Park. According to CW4 and CW5, they and the other undocumented workers were paid in cash by Nick Paone ("Paone"), a named principal of Tosa, and Steve Ritrovato ("Ritrovato"), a high-level employee of Tosa.

69.     According to CW4 and CW5, in this regard, Paone and Ritrovato, on behalf of Tosa, would pay the undocumented workers employed by Tosa subcontractor MM Carpentry as a subcontractor to Tosa and Horton by presenting them each with a check, which the worker would sign and return, whereby Paone and Ritrovato, on behalf of Tosa, would give the undocumented workers cash, less a 2% check-cashing fee. According to CW4 and CW5, no

payroll, Social Security, or unemployment taxes were withheld on those checks, and no overtime wages were ever paid to the workers for overtime hours worked.

70.    According to CW3, certain undocumented workers employed by Tosa subcontractor MM Carpentry complained to him that they were not being paid by Tosa subcontractor MM Carpentry or by Tosa for the hours they worked. Because CW3 knew that the undocumented workers from Tosa subcontractor MM Carpentry were not being paid wages for their actual hours, CW3 advocated on their behalf with his superiors at Horton.

71.    The same undocumented workers would often be rotated from one subcontractor to another on Horton's Plaza Grande at Garden State Park as well as to other Horton sites in New Jersey.  For example, in July 2006, another subcontractor, RSO Construction, hired the same undocumented workers from Tosa subcontractor MM Carpentry that had been working at Horton's Plaza Grande at Garden State Park worksite. The principal of RSO Construction regularly interacted with representatives from Tosa and CW3 on Horton's Plaza Grande at Garden State Park. According to CW2, the principal of Tosa subcontractor RSO Construction was himself an undocumented worker.

72.    According to CW3, the principal of Tosa subcontractor RSO Construction also met with representatives from Tosa and Horton to complain that Tosa was not paying Tosa subcontractor RSO Construction and its employees for their work.

73.    When Tosa failed to pay Tosa subcontractor RSO Construction employees their wages, the principal of Tosa subcontractor RSO Construction called a meeting with the undocumented workers, including CW4 and CW5, whereupon the entire RSO Construction undocumented worker crew decided to leave the Horton site because of nonpayment of wages.

The last day that Tosa subcontractor RSO Construction was on Horton's Plaza Grande at Garden State Park worksite was August 30th, 2006.

74.    Upon information and belief, certain of the undocumented workers filed suit against Tosa, N. Paone Framing, and Steve Ritrovato in the Superior Court of New Jersey, Special Civil Part, Essex County on December 1, 2006 for over $5,000 in unpaid wages.

75.    In June 2006, Tosa hired another subcontractor, Rodriguez Drywall, to perform framing work for Horton's Plaza Grande at Garden State Park.

76.    Tosa subcontractor Rodriguez Drywall also hired undocumented workers for their subcontracting work on Horton's Plaza Grande at Garden State Park project.  According to three of these undocumented workers, Confidential Witnesses 6, 7, and 8, ("CW6", "CW7" and "CW8"), Tosa subcontractor Rodriguez Drywall was to pay the undocumented workers $15 per hour for their work as framers at Horton's Plaza Grande at Garden State Park worksite. According to CW6, CW7 and CW8, they and the other undocumented workers labored at Horton's Plaza Grande at Garden State Park worksite without overtime compensation, in violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. 201, *et seq.*, as well as the New Jersey Prevailing wage law, N.J.S.A. 34:11-56(a)(4), which requires contactors to pay regulated overtime rates to employees.

77.    According to CW9, one of the workers from Tosa subcontractor Rodriguez Drywall told him that he worked for $14 per hour, but he would be paid "a little more" if he brought in his own tools to use.

78.    According to CW6, CW7 and CW8, after hiring a team of undocumented workers to perform the framing work at Horton's Plaza Grande at Garden State Park, Jose Rodriguez ("Rodriguez"), principal of Tosa subcontractor Rodriguez Construction, asked the undocumented workers if any of them had a bank account. When the undocumented workers indicated that they did not, CW6 stated that his girlfriend had a bank account. Rodriguez then entered into an arrangement with CW6 whereby a check was to be made out to the CW6's girlfriend and CW6 would disseminate cash from that check to pay his fellow undocumented workers.

79.    On June 28, 2006, Rodriguez gave CW6 a check for $2,000 for wages for the undocumented workers. According to CW6, no payroll, Social Security, or unemployment taxes were withheld on the check.

80.    On July 3, 2006, Rodriguez again gave CW6 a check to pay all the undocumented workers in early July 2006, and again no payroll taxes were withheld.  The check from Rodriguez was drawn on a Commerce Bank account belonging to Rodriguez's wife, Iris Rodriguez. Per the arrangement with Rodriguez, CW6 gave the check to his girlfriend to cash, but her bank returned the check, citing insufficient funds.  CW7 then gave the check to his wife to cash, but her bank also refused to cash the check, citing insufficient funds.

81.    On July 5, 2006, CW6 spoke to Young and informed him that Rodriguez had not paid wages for his crew.  CW9 had to act as a language translator to facilitate the conversation between CW6 and Young.

82.    Members of the Tosa subcontractor Rodriguez Drywall crew at Horton's Plaza Grande at Garden State Park would from time to time protest their lack of wages by reporting for work on the job site and then not working. On July 17, 2006, CW2 observed the Horton

supervisor asking members of the Tosa subcontractor Rodriguez Drywall crew at Horton's Plaza Grande at Garden State Park why they were not working, and they told the Horton supervisor that Tosa had not paid them in three to four weeks.

83.     The undocumented workers, including CW6, CW7, and CW8, went back to work at Horton's Plaza Grande at Garden State Park worksite, despite the fact that Rodriguez had not paid them, and appealed to CW3 to assist them in obtaining their unpaid wages. CW3 advised the undocumented workers not to do anything about the situation, and the undocumented workers finally left Horton's Plaza Grande at Garden State Park worksite in late July 2006 for nonpayment of wages.

84.     According to CW6, in January, 2007, Tosa subcontractor Rodriguez Drywall sent his girlfriend a Form 1099 by mail, which indicated that $20,000 had been paid to her by Tosa subcontractor Rodriguez Drywall, even though she had never worked with Tosa or Rodriguez Drywall. Further, according to CW6, neither he nor his girlfriend ever received any checks or monies from Tosa after the initial payment of $2,000 to pay the undocumented laborers and the second check which the bank could not cash. CW7 has retained bank records from the Bank of New York that memorialize the attempted deposit of that second $2000 check to his wife's account and the fact that it was "Returned Unpaid" by the bank on July 24, 2006.

85.     During a coffee break on July 10, 2006, members of the Tosa subcontractor SFL Construction work crew at Horton's Plaza Grande at Garden State Park told CW2 that they had been in the United States for three years but were planning to leave the United States in "a couple more years." When CW2 asked the workers why they were going to leave the United States, they told CW2 that they were undocumented and that because of their situation, their

lives could only consist of work and sleep. On July 6, 2006, members of the Tosa subcontractor SFL Construction work crew at Horton's Plaza Grande at Garden State Park told CW2 that they were paid $14 per hour in cash, and they worked ten to eleven hours per day, without overtime compensation for overtime hours worked.

86.     During a lunch break on July 11, 2006, members of the Tosa subcontractor SFL work crew at Horton's Plaza Grande at Garden State Park told CW2 and CW9 that they were undocumented and had come to the United States via Mexico.

87.     On July 19, 2006, six members of the Tosa subcontractor SFL work crew at Horton's Plaza Grande at Garden State Park arrived to work and were sent home by the Horton supervisor, because he could not communicate with them due to their inability to speak English.

88.     On July 21, 2006, the Horton supervisor told a worker from Tosa subcontractor MPT Contractors LLC "we don't pay for overtime."

89.     On July 1, 2006, the principal of Tosa subcontractor 5th Generation called CW2 to tell him that Tosa had not paid $19,000 in labor costs on Horton's Plaza Grande at Garden State Park and that they had instead given him a check for $2,000 that had twice been returned by the bank for insufficient funds.

90.     On July 7, 2006, the principal of Tosa subcontractor 5th Generation came to the job site and told the Horton supervisor that Tosa had not paid 5th Generation for its labor costs on Horton's Plaza Grande at Garden State Park.

91.     According to CW3, at all relevant times Horton employees approved timesheets for the laborers on Horton's Plaza Grande at Garden State Park, including laborers employed by Tosa subcontractors.

92.     On the afternoon of July 28, 2006, CW2 observed the Horton supervisor checking the invoices from subcontractors against the invoices reflecting wages to be paid for its laborers on Horton's Plaza Grande at Garden State Park.  According to CW2, the Horton supervisor would review the invoices and timesheets and Zack Colburn, Senior Project Manager for Horton, in Horton's Lancaster, Pennsylvania office, would give the final approval for the invoices to be paid.

93.     According to CW3, at all relevant times Horton employees approved invoices from the subcontractors on Horton's Plaza Grande at Garden State Park so that checks could be drafted for monies due the subcontractors, including Tosa.

94.     According to CW3, at all relevant times Horton drafted checks to Tosa, for invoices reflecting wages to be paid for its laborers on Horton's Plaza Grande at Garden State Park. Upon information and belief, Tosa were to use those funds for payment to Tosa subcontractors MM Carpentry, Rodriguez Drywall, and RSO Construction, SFL Construction, LS Construction, 5th Generation, MPT Contractor, JAR General Construction, Amarel, Savano, Silvanio and Brighton. Tosa in turn was to pay their laborers and the subcontractors using the funds from Horton.

95.     Horton's hiring of undocumented workers is not limited to the Horton's Plaza Grande at Garden State Park project. In fact, upon information and belief, it was an ongoing pattern and practice that Horton committed throughout New Jersey at its many work sites,

including but not limited to: "The Grande at Summerhill" in Delran, New Jersey; and "The Grande at Riverdale" in Riverdale, New Jersey.

## CLASS ALLEGATIONS

96.     This action is brought and may be maintained as a class action pursuant to Rule 4:32-1 of the Rules of this Court. Plaintiff NJRCC brings this action on behalf of itself and the Class (current and former hourly employees of Horton in New Jersey, including Horton's subcontractors' employees as well as members of the New Jersey Regional Council of Carpenters, whose wages have been depressed or who were unable to procure employment at Horton because of Horton and its subcontractors' employment of large numbers of undocumented workers).

97.     The Class is so numerous that joinder of all Class members is impracticable. Plaintiffs believe that the Class consists of many thousands of members, with the actual number of class members easily ascertainable through discovery of Horton's books and records.

98.     There are numerous questions of law and fact common to the Class, including, but not limited to:

- Whether Defendants' conduct violated the Construction Industry Independent Contractor Act;

- Whether Defendants are engaging in the Illegal Hiring Scheme;

- Whether Defendants knowingly or recklessly transported, hired, encouraged, or harbored undocumented workers the United States during the Class period;

- Whether Defendants accepted identification documents and other documents that authorize employment in the United States that Defendants knew or had reason to know were not lawfully issued for the bearer's use, were false and/ or were obtained by false statements;

- Whether Defendants committed wire fraud;

- Whether Defendants conduct the Illegal Hiring Scheme through its network of contractors and subcontractors;

- Whether Defendants' are part of an "enterprise" under the federal RICO and New Jersey RICO statutes;

- Whether the Illegal Hiring Scheme violates the Immigration and Nationality Act and federal RICO and New Jersey RICO statutes;

- Whether the Illegal Hiring Scheme has caused Class members' wages to be depressed; and

- Whether Defendants should be enjoined from conducting further racketeering activity.

99.    Plaintiffs' claims are typical of those of the Class in that they arise from the damages suffered as a result of the Illegal Hiring Scheme. Plaintiffs have no interests that are antagonistic or adverse to the other Class members.

100.    Plaintiffs are committed to the vigorous prosecution of this action, and have retained counsel who are competent in the prosecution of class actions, RICO, and complex litigation. Accordingly, Plaintiffs will fairly and adequately protect and represent the interests of the Class.

101.    Questions of law or fact common to the Class predominate over issues affecting individual Class members. A class action is the only appropriate method for the fair and efficient adjudication of this action for the following reasons, among others:

- The individual amount of damages involved, while not insubstantial, are generally not large enough to justify individual actions;

- The cost of individual actions would unreasonably consume the amounts that would be recovered;

- Individual actions would unduly burden the judicial system; and

- Individual actions brought by Class members would create a risk of inconsistent results and would be unnecessarily duplicative of this litigation.

102.    Plaintiffs anticipate no difficulty in the management of this action. The evidence providing that Horton and its subcontractors are engaging in the alleged conduct is common to the Class. Further, the identities of the Class members are known to Horton, and damages can be calculated to a reasonable certainty through expert testimony.

## COUNT I

### (Violation of the Construction Industry Independent Contractor Act, N.J. Stat. § 34:20 *et seq.*)

103.    Plaintiffs NJRCC and the Class reallege and incorporate by reference herein the allegations set forth in Paragraphs 1 through 102 as if fully restated hereinafter.

104.    The Construction Industry Independent Contractor Act, N.J. Stat. § 34:20 concerns the misclassification of construction employees for certain purposes and supplements Title 34 of the Revised Statutes of New Jersey. In enacting the Construction Industry Independent Contractor Act, the New Jersey Legislature found:

> employers in the construction industry who improperly classify employees as independent contractors deprive these workers of proper Social Security benefits and other benefits, while reducing the employers' State and federal tax withholdings and related obligations. Moreover, this practice puts businesses that bear higher costs for complying with the law at a competitive disadvantage.

105.    The Construction Industry Independent Contractor Act "debars certain employers from public work and establishes criminal penalties for misclassification of construction workers

as independent contractors." More specifically, the Construction Industry Independent Contractor Act sets up criminal penalties for contractors who knowingly classify full-time employees as independent contractors to avoid state and federal taxes, and further creates the presumption that construction workers are full-time employees unless proven otherwise, calling for fines up to $75,000 for violators. Additionally, contractors that engage in this practice may be ineligible for public contracts under the statute.

106. The Construction Industry Independent Contractor Act defines an "employer" as "a partnership, association, joint stock company, trust corporation, or other legal business entity or successor thereof who is primarily engaged in the business of, or enters into a contract for making improvements to real property and includes any subcontractor or lower tier contractor," (emphasis added). Defendants Horton and Tosa are employers within the meaning of the Construction Industry Independent Contractor Act.

107. On July 19, 2007, New Jersey Governor Jon S. Corzine signed this legislation, stating: "Companies that misclassify workers to avoid taxes hurt their workers and hurt the public. . . . This bill ensures that any attempt by companies to shirk their responsibility to their employees and to the public will now be met with a hefty penalty."

108. The Illegal Hiring Scheme described herein constitutes a violation of the Construction Industry Independent Contractor Act, N.J. Stat. § 34:20.

109. The Construction Industry Independent Contractor Act, N.J. Stat. § 34:20-8 provides that "An individual employed as a construction worker who has not been properly classified as an employee may bring a civil action for damages against the employer or any other employer who was in contract with the employee, for failing to properly classify the employee if

the employer had knowledge of the misclassification. An individual representative, including a labor organization, may bring the action on behalf of the individual or as a class action."

110.     As a labor organization, Plaintiff NJRCC is authorized under the Construction Industry Independent Contractor Act to bring an action against Defendants for failing to properly classify its construction workers as employees. N.J. Stat. § 34:20-8. As described herein, Horton and Tosa have engaged in the misclassification of construction employees.

111.     The injuries suffered by Plaintiffs NJRCC and the Class were caused by Defendants' violations of N.J. Stat. § 34:20.

112.     Upon information and belief, violations of the Construction Industry Independent Contractor Act by Horton and its subcontractors continue at Horton sites throughout New Jersey.

113.     Pursuant to N.J. Stat. § 34:20-8, Plaintiffs NJRCC and the Class are entitled to recover attorneys fees and other costs of the action in addition to damages to the class of individual employees.

**COUNT II**

**(Violation of 18 U.S.C. § 1962(c) and N.J.S.A. 2C:41)**

**THE RACKETEERING ACTS and RICO ALLEGATIONS**

114.     Plaintiffs reallege and incorporate by reference herein the allegations set forth in Paragraphs 1 through 113 as if fully restated hereinafter.

115.     Defendants are engaged in an ongoing pattern of racketeering activity as defined by 18 U.S.C. § 1961 (5) and N.J.S.A. 2C:41-2c, by committing, or aiding and abetting in the commission, of at least two acts of racketeering activities within the past ten years.

A.    Violation of the Immigration and Nationality Act

116.    For purposes of federal RICO, the racketeering activity includes an open and ongoing pattern of violations of Section 274 of the Immigration and Nationality Act, 8 U.S.C. § 1324(a).

117.    Specifically, in furtherance of and to effectuate the Illegal Hiring Scheme, Horton and its subcontractors have violated and continue to violate 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime to: "knowingly hire[] for employment at least 10 individuals with actual knowledge that the individuals are aliens . . ." during a 12 month period.  Horton and its subcontractors have violated this provision of the Act, including by employing more than 10 aliens per year each year for at least the last two years, knowing that each such person was (a) smuggled or otherwise brought into the United States in violation of U.S. law ; (b) illegally harbored once in the United States; (c) not lawfully admitted to the United States for permanent residence; and/or (d) not authorized for employment in the United States.

118.    Horton and its subcontractors, in furtherance of and to effectuate the Illegal Hiring Scheme, have also violated and continue to violate 8 U.S.C. § 1324(a)(1)(A)(iii), which makes it a federal crime to "conceal,[], harbor[] or shield from detection, or attempt[] to conceal, harbor or shield from detection . . ." aliens who have entered the U.S. illegally.  Defendants have violated this provision by (a) knowingly or recklessly employing illegal aliens within its facilities and/ or (b) taking steps to shield those illegal aliens from detection, by, among other things, paying such illegal aliens in cash, and through funding certain of the undocumented workers' housing.

119.    Furthermore, Horton and its subcontractors, in furtherance of and to effectuate the Illegal Hiring Scheme, have also violated and continue to violate 8 U.S.C. §1324(a)(1)(A)(iv), which prohibits any person or entity from "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law[.]" By knowingly or recklessly employing and harboring undocumented aliens on its New Jersey worksites facilities, Horton and its subcontractors have helped hundreds of aliens to avoid detection and enabled them to remain in the United States in violation of U.S. law. And by successively hiring and employing the same false and/or not lawfully issued to the bearer to falsely verify the eligibility of the work authorization documents that reflect different identities for these aliens, Horton and its subcontractors has knowingly or recklessly encouraged any undocumented aliens that are discovered to return to the United States and to their employment at Horton and its subcontractors in violation of United States law.

120.    Horton and its subcontractors, in furtherance of and to effectuate the Illegal Hiring Scheme, have also violated and continue to violate 8 U.S.C. §1324(a)(1)(A)(ii), which prohibits any person or entity knowingly or with reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, "transports, or moves or attempts to move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law."

121.    Each violation of 8 U.S.C. § 1324 constitutes an act of "racketeering activity" under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(F).

122. Each violation of 8 U.S.C. § 1324 constitutes "racketeering activity" under the New Jersey RICO Act, N.J.S.A. 2C:41-1 *et seq.*

123. The racketeering activity also includes open and ongoing violations of 18 U.S.C. § 1546(a), in furtherance of and to effectuate the Illegal Hiring Scheme, including Horton and its subcontractors' acceptance of identification documents and other documents that authorize employment in the United States that Horton and its subcontractors knew or had reason to know were not lawfully issued for the bearer's use, were false and/or were obtained by false statements.

124. Horton and its subcontractors have also violated and continue to violate 18 U.S.C. § 1546(b), in furtherance of and to effectuate the Illegal Hiring Scheme, by using identification documents that Horton and its subcontractors knew or had reason to know were false and/or not lawfully issued to the bearer to falsely verify the eligibility of the persons presenting them to work at Horton and its subcontractors. Each violation of 18 U.S.C. § 1546 constitutes "racketeering activity" under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961(B).

125. Defendants also violated and continue to violate 18 U.S.C. § 1546(b) by using identification documents that Defendants knew or had reason to know were false and/ or not lawfully issued to the bearer to falsely verify the eligibility of the persons presenting them to work at Horton and its subcontractors, and recording information from those documents on I-9 forms.

126. Each violation of 18 U.S.C. §1546 constitutes "racketeering activity" under the federal RICO Act, 18 U.S.C. 1961(B).

127.    Each violation of 18 U.S.C. § 1546 also constitutes "racketeering activity" under the New Jersey RICO Act, N.J.S.A. 2C:41-1 *et seq.*

**B.    Wire Fraud**

128.    Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  The acts committed in furtherance of the Illegal Hiring Scheme constitute a violation of Wire Fraud, 18 U.S.C. §1343.

129.    18 U.S.C. § 1343 prohibits the use of the wires for the purpose of carrying out a fraud.

130.    Defendants used United States wires in furtherance of and to effectuate the Illegal Hiring Scheme as described herein.

131.    In furtherance of and for the purpose of executing and attempting to execute the Illegal Hiring Scheme, Defendants Horton and Tosa, each, along with their subcontractors, on numerous occasions, used and foreseeably caused to be used United States wire communications in interstate commerce.  These wire communications were made, inter alia, with the purpose of transmitting invoices for payment of labor costs connected with the Illegal Hiring Scheme.

132.    Upon information and belief, examples of such use of United States wires includes, but is not limited to, the following:

• A facsimile from Tosa's Pennsylvania office to Horton's New Jersey office on April 20, 2006 of a contract invoice for labor costs for payments for supervisors, foremen, and "carpenter labor" labor, including, upon information and belief labor costs billed for undocumented workers on Horton's Plaza Grande at Garden State Park, which, upon

information and belief, Horton's New Jersey office then returned faxed to Tosa's Pennsylvania office on May 22, 2006.

- A facsimile from Tosa's Pennsylvania office to Horton's New Jersey office on April 24, 2006 of a contract invoice for labor costs for payments for foremen and "carpenter labor" labor, including, upon information and belief labor costs billed for undocumented workers on for labor costs on Horton's Plaza Grande at Garden State Park, which, upon information and belief, Horton's New Jersey office then returned faxed to Tosa's Pennsylvania office on May 22, 2006.

- A facsimile from Tosa's Pennsylvania office to Horton's New Jersey office on April 30, 2006 of a contract invoice for labor costs for payments for supervisors, foremen, and "carpenter labor" labor, including, upon information and belief labor costs billed for undocumented workers on Horton's Plaza Grande at Garden State Park.

- A facsimile from MPT Contractors LLC's New Jersey office to Tosa's Pennsylvania office on June 27, 2006 of a contract invoice for labor costs for payments for supervisors, foremen, and "carpenter labor" labor, including, upon information and belief labor costs billed for undocumented workers on Horton's Plaza Grande at Garden State Park.

- A facsimile from MPT Contractors LLC's New Jersey office to Tosa's Pennsylvania office on July 5, 2006 of a contract invoice for labor costs for payments for supervisors, foremen, and "carpenter labor" labor, including, upon information and belief labor costs billed for undocumented workers on Horton's Plaza Grande at Garden State Park.

133.    The conduct, acts, and omissions of Horton and its subcontractors were an integral part of the overall pattern and practices described herein, including using the wires of the United States in interstate commerce to profit from the Illegal Hiring Scheme.

134.    Each such use of a wire communication in connection with the described scheme constitutes a separate and distinct violation of N.J.S.A. 2C:41-1(a)(2), by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. § 1343.  While Plaintiffs do not have full knowledge of the extent of the use of the wires by the enterprise in furtherance of the Illegal Hiring Scheme, the conduct described above identifies some but not all of these violations.

C.    The RICO Enterprise, 18 U.S.C. § 1961(4)

135.    Horton, Tosa, and the subcontractors who undertook work on Horton sites throughout New Jersey are a group of persons associated together for the common purposes of carrying out the Illegal Hiring Scheme. As a result, this group constituted an association-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

136.    As detailed above, beginning no later than 2006 and continuing at least to the present, the enterprise conspired to and conducted or participated, directly or indirectly, in the conduct of the enterprise, through a pattern of racketeering activity, which affected interstate commerce within the meaning of 18 U.S.C. §1962(c).

137.    Beginning no later than 2006 and continuing at least to the present, each of the conspirators associated with this enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5), in violation 18 U.S.C. §1962(c).

138.   Specifically, at all relevant times, Horton, Tosa, and their subcontractors engaged in racketeering activity within the meaning of 18 U.S.C. §1961(1) by engaging in the acts set forth above, and in particular, in Paragraphs 1 through 95 above.  The acts set forth in these paragraphs constitute a violation of one or more of the following statutes:  Immigration and Nationality Act 8 U.S.C. §1324 *et seq.* and Wire Fraud, 18 U.S.C. §1343.

139.   The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).  The acts alleged are related to one another by virtue of common participants, common victims, common methods of commission, and the common purpose and common result of depressing wages to the Class and depriving Plaintiff Brookside of business profits.  The Illegal Hiring Scheme has continued since at least April 2006.

140.   Defendants association with its contractors and subcontractors also permits them to shift responsibility for much of the illegal activity to others, thereby using the enterprise as a front to facilitate more racketeering activity than it could possibly commit on its own.  For example, CW3 has described certain contractors and subcontractors as the perfect "go-betweens" for Horton and TOSA supervisors and managers seeking low-wage workers because of their exposure to distinct immigrant communities.  Defendants, nonetheless, embraced the hiring of undocumented workers, even though it knew or should have known the workers were ineligible to be employed in the United States.

141.   Defendants clearly have knowledge of the Illegal Hiring Scheme.  As detailed by CW3, "there is no possible way that Horton would not have known at its job sites that the workers were undocumented."  Likewise, Horton and TOSA, through accounting records, knew

or should have known that both the undocumented workers and subcontractors failed to pay taxes.

142. Each association between Defendants and their contractors and subcontractors servicing each of the Horton facilities constitutes an association-in-fact enterprise affecting interstate commerce pursuant to 18 U.S.C. § 1961(4). However, the contractors and subcontractors have existences apart from their affiliation with the Enterprise. They conduct both legitimate and illicit activities.

143. Horton and Tosa, "persons" within the meaning of RICO, have committed a pattern of racketeering activity through the association-in-fact enterprises with each other and their contractors and subcontractors since at least 2006. Section 1962(c) of RICO and N.J.S.A. 2C:41-2c makes it illegal "[f]or any person. . . associated with any enterprise. . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs. . . through a pattern of racketeering activity."

### D. Pattern of Racketeering Activity

144. The federal RICO pattern of racketeering activity engaged in by Defendants consist of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

145. The multiple acts of racketeering activity committed by Defendants, and or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the Illegal Hiring Scheme, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5). Each

act of racketeering was related, had a similar purpose, involved the same or similar participants and method of commission, and had similar results.

146.   Likewise, Defendants are engaged in an ongoing pattern of racketeering activity as defined by N.J.S.A. 2C:41-1.  The New Jersey RICO pattern of racketeering activity engaged in by Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

### E.   The Racketeering Acts Committed by Defendants Are Related

147.   The acts of racketeering activity committed by Defendants have the same or similar methods of commission in that they involve the knowing employment of undocumented workers, the concealment, harboring and shielding from detection of undocumented workers, and the acceptance or use of fraudulent documents in connection with the hiring of undocumented workers.  Moreover, Defendants failed and continue to fail paying unemployment and workers compensation insurance, health and welfare benefits, and applicable federal, state, local and social securities taxes.  These racketeering acts committed by Defendants all have a similar objective: the depression of wages paid to Defendants' hourly workers, and avoidance of insurance and taxes in order to improve Horton's profits.

148.   The acts of racketeering activity committed by Defendants are otherwise related by such distinguishing characteristics including, but not limited to, the involvement of Defendants, undocumented workers, and other members of the association-in-fact enterprise discussed above in Paragraphs 1 through 147.

-39-

F.    **The Racketeering Acts Committed by Defendants Involve a Distinct Threat of Long-Term Racketeering Activity**

149.    Defendants' racketeering acts involve a distinct threat of long-term racketeering activity.  Defendants' practice of knowingly employing, harboring, concealing and shielding undocumented workers from detection, and Defendants' acceptance and use of documents that are not lawfully issued and/ or are false identification is ongoing at the present time and will continue in the future unless halted by judicial intervention.

150.    Defendants' knowing employment, harboring, concealing, transporting and shielding undocumented workers from detection, and Defendants' acceptance and use of documents that are not lawfully issued and/ or are false identification is part of Defendants' regular manner of conducting business.

151.    Plaintiffs NJRCC and the Class have been damaged in their business and property rights through their employment at depressed wages by Horton.  These injuries are the direct, proximate and intended result of Horton's Illegal Hiring Scheme, which is targeted at Horton's hourly workers.  These injuries were the intended and foreseeable consequence of the Illegal Hiring Scheme and are compensable pursuant to Section 1964(c) of RICO and N.J.S.A. 2C:41-4.

152.    Horton knows that the Illegal Hiring Scheme drives down the wages paid to all the workers at its facilities throughout the United States.  Horton accepted and retained the benefits of the acts of racketeering activity, thereby ratifying the conduct of its managers, employees, and the members of the enterprise who assisted Horton in committing those acts of racketeering activity.

153.   Defendants' violations of both federal and New Jersey RICO proximately caused the wages of Plaintiffs NJRCC and the Class to be depressed below what they would have been in a labor market comprised of legally employed workers.

154.   Plaintiffs NJRCC and the Class have suffered an injury to their "business property", namely, lost wages, as a direct result of Defendants' violations of federal RICO, and injury as a result of Defendants' violations of New Jersey RICO.

155.   Defendants' unlawful conduct has permitted Defendants to earn and/ or retain significant funds to which they are not entitled.   For example, Defendants' widespread employment of undocumented workers has permitted Defendants to depress the wages for their hourly workers and further reduce the expenses it incurs as a result of workers compensation claims.  Such savings contribute to Defendants' profit margins and provide the financial motive for Defendants' participation in the Illegal Hiring Scheme.

## G.   Defendants Caused Plaintiffs NJRCC And The Class' Wages To Be Depressed

156.   The foregoing conduct constitutes a violation of 18 U.S.C. § 1962(c).

157.   Plaintiffs NJRCC and the Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. § 1962(c).   Plaintiffs and members of the Class were employed by Defendants at wages which were depressed as a direct result of the Illegal Hiring Scheme.   Plaintiffs and members of the Class were the intended and direct victims of Defendants' RICO scheme and their injury, working at depressed wages, was both intended and foreseeable. As a direct result of the Illegal Hiring Scheme, Defendants were able to profit.

158.   The injuries suffered by Plaintiffs NJRCC and the Class were caused by Defendants' violations of 18 U.S.C. § 1962(c).

159.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs NJRCC and the Class are entitled to recover threefold the damages they have sustained and their costs of the action, including reasonable attorneys' fees.

160.   The foregoing conduct constitutes a violation of N.J.S.A. 2C:41.

161.   Plaintiffs NJRCC and the Class have been injured in their property by reason of Defendants' violations of N.J.S.A. 2C:41.  Plaintiffs NJRCC and the Class were employed by Defendants at wages which were depressed as a direct result of the Illegal Hiring Scheme. Plaintiffs NJRCC and the Class were the intended and direct victims of Defendants' RICO scheme and their injury, working at depressed wages, was both intended and foreseeable.  As a direct result of the Illegal Hiring Scheme, Defendants were able to profit.

162.   The injuries suffered by Plaintiffs NJRCC and the Class were caused by Defendants' violations of N.J.S.A. 2C:41.

163.   Pursuant to N.J.S.A. 2C:414(c), Plaintiffs NJRCC and the Class are entitled to recover threefold the damages they have sustained and their costs of the action, including reasonable attorneys' fees.

**H.     Defendants Caused Plaintiff Brookside Damage To Their Business**

164.    Defendants' violations of both federal and New Jersey RICO proximately caused damage to Plaintiff Brookside's business by preventing using a labor market comprised of undocumented workers.

165.    Plaintiff Brookside has suffered an injury to its "business property", namely, loss of its building contract, as a direct result of Defendants' violations of federal RICO, and injury as a result of Defendants' violations of New Jersey RICO.

166.    Defendants' unlawful conduct has permitted Defendants to earn and/ or retain significant funds to which they are not entitled.   For example, Defendants' widespread employment of undocumented workers has permitted Defendants to further reduce the expenses it incurs.  Such savings contribute to Defendants' profit margins and provide the financial motive for Defendants' participation in the Illegal Hiring Scheme.

167.    The foregoing conduct constitutes a violation of 18 U.S.C. § 1962(c).

168.    Plaintiff Brookside has been injured in their property by reason of Defendants' violations of 18 U.S.C. § 1962(c).  Plaintiff Brookside was the intended and direct victim of Defendants' RICO scheme and the injury to their business was both intended and foreseeable. As a direct result of the Illegal Hiring Scheme, Defendants were able to profit.

169.    The injuries suffered by Plaintiff Brookside was caused by Defendants' violations of 18 U.S.C. § 1962(c).

170.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff Brookside is entitled to recover threefold the damages it has sustained and their costs of the action, including reasonable attorneys' fees.

171.    The foregoing conduct also constitutes a violation of N.J.S.A. 2C:41.

172.    Plaintiff Brookside has been injured in its property by reason of Defendants' violations of N.J.S.A. 2C:41. Plaintiff Brookside lost their building contract as a direct result of the Illegal Hiring Scheme. Plaintiff Brookside was an intended and direct victim of Defendants' RICO scheme and their business injury was both intended and foreseeable. As a direct result of the Illegal Hiring Scheme, Defendants were able to profit.

173.    The injuries suffered by Plaintiff Brookside was caused by Defendants' violations of N.J.S.A. 2C:41.

174.    Pursuant to N.J.S.A. 2C:41-4(c), Plaintiff Brookside is entitled to recover threefold the damages it has sustained and their costs of the action, including reasonable attorneys' fees.

175.    As a result of Defendants' violation of 18 U.S.C. §1962(c), the Class and Plaintiff Brookside have suffered damages.

176.    As a result of Defendants' violation of 18 U.S.C. §1962(c), Defendants are liable to the Class and Plaintiff Brookside for their losses in an amount to be determined at trial.

## COUNT III

### (Violation of 18 U.S.C. § 1962(d) and N.J.S.A. 2C:41-2(d))

## RICO CONSPIRACY

177.    Plaintiffs reallege and incorporate by reference herein the allegations set forth in Paragraphs 1 through 176 as if fully restated hereinafter.

178.    Upon information and belief, Horton and Tosa, being persons associated with an enterprise which engaged in, and whose activities affected, interstate commerce, knowingly and unlawfully conspired and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs and activities of the enterprise, through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and 1962(d), by each Defendant agreeing to personally commit or aid and abet the commission of at least two of the acts of racketeering with which each defendant is charged herein.

179.    Specifically, Horton and Tosa conspired to conduct and/or participate in the conduct of the enterprise's affairs by, among other things, taking actions alone or in concert to perpetrate the Illegal Hiring Scheme.

180.    The pattern of racketeering activity consisted of Horton and Tosa's acts of racketeering activity as described in Paragraphs 1 through 176 above. Horton and Tosa engaged in the Illegal Hiring Scheme to lower their own costs and to depress wages to lawful workers, as well as to damage Brookside's business, through a variety of illegal acts designed to effectuate the Illegal Hiring Scheme.

181.    The actions described in Paragraphs 1 through 176 above constitute a "pattern of racketeering activity" as that term is defined in 18 U.S.C. § 1961(5). This pattern of racketeering activity lasted over a period of at least two years, and had the purpose of depressing the wages to lawful workers and damaging Brookside's business.

182.    Horton and Tosa engaged in an open-ended and continuous pattern of racketeering activity by committing multiple acts of racketeering activity, including wire fraud, violations of the Section 274 of the Immigration and Nationality Act, and violations of 18 U.S.C. § 1546(a) over at least a two-year period.

183.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. §§ 1964(c) and 1964(d), in that they have suffered monetary damages as a result of the illegal acts of Defendants.

184.    In connection with the above-described acts, Defendants acted with knowledge of the Illegal Hiring Scheme with complete disregard for the rights of the Plaintiffs, as well as other entities.

185.    Upon information and belief, Horton and Tosa, conspired to violate N.J. Stat. 2C:41-2(c).

186.    Specifically, Horton and Tosa conspired to conduct and/or participate in the conduct of the enterprise's affairs by, among other things, taking actions alone or in concert to perpetrate the Illegal Hiring Scheme.

187.    The pattern of racketeering activity consisted of Horton and Tosa's acts of racketeering activity as described in Paragraphs 1 through 176 above. Horton and Tosa engaged in the Illegal Hiring Scheme to lower their own costs and to depress wages to lawful workers, as well as to damage Brookside's business, through a variety of illegal acts designed to effectuate the Illegal Hiring Scheme.

188.    The actions described in Paragraphs 1 through 176 above constitute a "pattern of racketeering activity" as that term is defined in N.J. Stat. 2C:41-2(d). This pattern of racketeering activity lasted over a period of at least two years, and had the purpose of depressing the wages to lawful workers and damaging Brookside's business.

189.    Horton and Tosa engaged in an open-ended and continuous pattern of racketeering activity by committing multiple acts of racketeering activity, including wire fraud, violations of the Section 274 of the Immigration and Nationality Act, and violations of 18 U.S.C. § 1546(a) over at least a two-year period.

190.    As a direct and proximate result of Defendants' violations of N.J. Stat. 2C:41-2(c) and N.J. Stat. 2C:41-2(d), Plaintiffs have been injured in their business or property within the meaning of N.J. Stat. 2C:41-2(c), in that they have suffered monetary damages as a result of the illegal acts of Defendants.

191.    In connection with the above-described acts, Defendants acted with knowledge of the Illegal Hiring Scheme with complete disregard for the rights of the Plaintiffs, as well as other entities.

## PRAYER FOR RELIEF

Plaintiffs NJRCC and the Class and Plaintiff Brookside, to the extent allowable by law, demand judgment and other relief as follows:

A.   Certification of the Class pursuant to pursuant to Rule 4:32-1 of the Rules of this Court;

B.   Judgment for compensatory damages sustained by the Class and Brookside by Defendants' participation in the Illegal Hiring Scheme;

C.   Judgment in an amount equal to three times the damages sustained by the Class and Brookside by Horton's racketeering activity, including the Illegal Hiring Scheme, pursuant to 18 U.S.C. § 1964(c) and N.J.S.A. 2C:41-4;

D.   Preliminary and permanent injunctions enjoining Horton from any further racketeering activity;

E.   Judgment for the damages sustained by reason of Defendants' violation of the Construction Industry Independent Contractor Act, N.J. Stat. § 34:20;

F.   Reasonable attorneys' fees, costs, and disbursements pursuant to 18 U.S.C. § 1964(c), N.J.S.A. 2C:41-4(c) and N.J. Stat. § 34:20-8;

G.   Trial by jury; and

H.   Such other relief as the Court deems just and proper.

KROLL HEINEMAN GIBLIN, LLC

By: _____
Albert G. Kroll, Esq.
Vincent M. Giblin, Esq.
James M. Monica, Esq.
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Tel: (732) 491-2100
Fax: (732) 491-2120

Dated: March 19, 2008
at Iselin, New Jersey

**Counsel for Brookside Construction:**

**SALDUTTI LAW LLC**
Robert L. Saldutti, Esq.
800 N. Kings Highway, Suite 300
Cherry Hill, NJ 08034
Telephone:    (856) 779-0300
Facsimile:    (856) 779-0355

**Additional Counsel for All Plaintiffs:**

**MILBERG WEISS LLP**
Benjamin Y. Kaufman, Esq.
Anita Kartalopoulos, Esq.
Carla F. Fredericks, Esq.
One Pennsylvania Plaza
New York, NY 10119
Telephone:    (212) 594-5300
Facsimile:    (212) 868-1229

## JURY DEMAND

Plaintiffs demand a trial by jury on all Counts so triable.

KROLL HEINEMAN GIBLIN, LLC

By:  _____
ALBERT G. KROLL

Dated:  March 19, 2008
at Iselin, New Jersey

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:5-1(c), VINCENT M. GIBLIN, ESQ. is hereby designated as trial counsel in this matter.

KROLL HEINEMAN GIBLIN, LLC

By: _____
ALBERT G. KROLL

Dated: March 19, 2008
at Iselin, New Jersey


## R. 4:5-1 CERTIFICATION

I hereby certify in accordance with R. 4:5-1(b)(2), that to the best of my knowledge and belief, the matter in controversy is not the subject of any other actions pending in any court or of a pending arbitration proceeding, and no further action or arbitration is contemplated. I further certify that there are no other parties who should be joined in the within cause of action.

KROLL HEINEMAN GIBLIN, LLC

By: _____
ALBERT G. KROLL

Dated: March 19, 2008
at Iselin, New Jersey