NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NEW JERSEY REGIONAL COUNCIL OF CARPENTERS; BROOKSIDE CONSTRUCION CORPORATION OF SEWELL, NEW JERSEY**; *individually and on behalf of a class*,

Plaintiffs,

v.

**D.R. HORTON, INC.; TOSA CONSTRUCTION, INC./N. PAONE CONSTRUCTION, INC.**,

Defendants.

Civil Action No. 08-1731 (KSH)

OPINION

**Katharine S. Hayden, U.S.D.J.**

**I.     Introduction**

This opinion addresses the vigorously litigated issue of this Court's personal jurisdiction over D.R. Horton, Inc. ("Horton").

Plaintiffs New Jersey Regional Council of Carpenters ("NJRCC") and Brookside Construction Company, Inc. ("Brookside") filed the underlying action in state court against defendants Horton, D.R. Horton-New Jersey ("Horton-N.J."), and Tosa Construction, Inc. for violations of the federal and New Jersey RICO statutes and the New Jersey Construction Industry Independent Contractor Act. (*See* Am. Compl.) [D.E. 57]. The amended complaint alleges that defendants participated in a scheme to knowingly hire undocumented workers for the

purpose of depressing wages, decreasing costs, and avoiding the payment of employee benefits and payroll taxes. (*Id.*)

Defendants removed the case to this Court, and Horton filed a motion to dismiss for lack of personal jurisdiction [D.E. 20]. After the motion was fully briefed by the parties, Magistrate Judge Michael Shipp issued a Report and Recommendation ("R&R") [D.E. 37], recommending a denial of Horton's motion. Horton filed objections to the proposed R&R [D.E. 38], and plaintiffs responded to those objections [D.E. 43]. This Court responded to the parties' evident disputes about Horton's contacts with New Jersey by ordering limited discovery relating to the issue of personal jurisdiction [D.E. 44], to be supervised by Magistrate Judge Shipp.

The discovery that was produced was substantial and consisted of, among other documents, depositions of Horton employees, including Northeastern Region President, George Seagraves; corporate documents, including Horton's corporate manual, contracts and agreements for sale; corporate policies, including Horton's workers' compensation and employers' liability insurance policies; and other miscellaneous items, including copies of website pages and press releases. Briefing followed, and this Court now decides Horton's motion for summary judgment [D.E. 58].

## II.   Personal Jurisdiction

Horton moves for summary judgment in its favor on its affirmative defense of lack of personal jurisdiction. A district court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c).

Magistrate Judge Shipp's R&R discussed, and the parties do not dispute, the basic and familiar legal requirements for establishing personal jurisdiction. New Jersey's long-arm statute allows courts to assert personal jurisdiction to the outermost extent permissible under the Fourteenth Amendment to the Constitution. *See* N.J. Ct. R. 4:4-4; *Charles Gendler & Co. v. Telecom Equip. Corp.*, 102 N.J. 460, 469 (1986); *De James v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 (3d Cir. 1981). Thus, to determine whether subjecting Horton to personal jurisdiction comports with the Due Process Clause, this Court must examine "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977).

Personal jurisdiction exists when a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). A federal court may assert jurisdiction under one of two theories: specific jurisdiction or general jurisdiction. *Watiti v. Walden Univ.*, 2008 U.S. Dist. LEXIS 43217, at *5-6 (D.N.J. 2007) (Pisano, J.) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 & n. 8, 9 (1984)). A plaintiff may prove general jurisdiction by establishing that there are sufficient contacts for a court to assert "personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." *Helicopteros*, 466 U.S. at 414 n.9. A court obtains general jurisdiction over the defendant when the defendant "has maintained continuous and substantial forum affiliations." *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*,

3

675 F.2d 587, 588 (3d Cir. 1982) (citing *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)).

If the defendant lacks the "continuous and systematic" in-forum presence necessary to confer general jurisdiction, he may still be subject to specific jurisdiction. *International Shoe Co.*, 326 U.S. at 317. Three elements are required for specific jurisdiction. First, the defendant must have purposefully directed sufficient "minimum contacts" with the forum such that it reasonably should have anticipated the possibility of being haled into court there. *See Burger King Corp.*, 417 U.S. at 475 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Second, the plaintiff's claim must arise out of its contacts with the state. *See Dollar Sav. Bank v. First Sec. Bank, N.A.*, 746 F.2d 208, 211 (3d Cir. 1984). Third, the assertion of personal jurisdiction must not "offend International Shoe's traditional notions of fair play and substantial justice." *Id.* at 213. Factors to be considered on this point include: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *World-Wide Volkswagen*, 444 U.S. at 292.

Personal jurisdiction can also be asserted in a parent-subsidiary context under three separate theories: (1) the "single entity" test, (2) the agency theory, or (3) the alter ego doctrine. The "forum contacts of a subsidiary corporation will not be imputed to a parent corporation for jurisdictional purposes without a showing of something more than mere ownership." *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp 2d 601, 609 (D.N.J. 2004) (Linares, J.) (citing *State Dep't of Envtl. Prot. V. Ventron Corp.*, 94 N.J. 473, 500 (1983)). Courts in this Circuit must consider "whether

the subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded." *Id.* (quoting *Lucas v. Gulf & W. Indus., Inc.*, 666 F.2d 800, 806 (3d Cir. 1981)). If a court is satisfied that a "subsidiary [i]s a mere instrumentality of the parent corporation," or that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent," then it may pierce the corporate veil and entertain the case. *Ventron*, 94 N.J. at 502 (internal quotations omitted).

Under the "single entity" theory, which is the most applicable to the facts here, courts will impute the forum contacts of the subsidiary to the parent when the two entities "are, in reality, operating as a corporate combine." *Greenway Ctr., Inc. v. Essex Ins. Co.*, 2008 U.S. Dist. LEXIS 62666, at *17 (M.D. Pa. Aug. 6, 2008), *overruled on other grounds*; *see also Genesis Bio-Pharm., Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 98 (3d Cir. 2002) ("The relevant jurisdictional inquiry is 'whether the [subsidiary] and the parent . . . so operate as [a] single entity, or unified and cohesive economic unit . . . ; [this] 'single entity' test requires that a parent over which the court has jurisdiction so control and dominate a subsidiary as in effect to disregard the latter's independent corporate existence.").

### A.  General Jurisdiction

To exercise general jurisdiction over Horton, the Court must be satisfied that Horton "has maintained continuous and substantial forum affiliations." *Reliance Steel*, 675 F.2d at 588 (citing *International Shoe Co.*, 326 U.S. 310). This Court finds that there is more than sufficient evidence to satisfy plaintiffs' position that Horton's contacts with New Jersey are "continuous and systematic." *International Shoe Co.*, 326 U.S. at 320.

The Court looks first to Horton employees' regular visits to New Jersey. From the evidence presented, the Court firmly rejects Horton's characterization of these visits as "irregular and sporadic." (Moving Br. 21) (citing to Horton Interrogatory Response, Exh. 16). For example, George Seagraves, Horton's Northeast Region President, travels to New Jersey approximately two times per year to meet with the Horton-N.J. personnel. (Seagraves Tr., 122-134, 166-67, Exh. 3; Moving Br. 21.) While in New Jersey, Seagraves reviews plans for land acquisition, takes tours of ongoing construction projects, and sometimes tours land or lots targeted for acquisition by Horton-N.J. (Moving Br. 21.) He attended the January 2006 meeting with NJRCC's representatives, at which time it was agreed that union carpenters would work on the Plaza Grande at Garden State development. (Pechmann Aff. ¶ 6, Exh. 5.)

In addition, Michael Scroetke, Horton's CFO for the North region, visits Horton-N.J. approximately one or two times per year "for the purpose of reviewing financial information." (Moving Br. 21.) By Horton's own admission, its regional attorney has traveled to New Jersey twice in the last five years. (*Id.*) Moreover, Donald Horton, the Chairman of the Board, and Don Tomnitz, the President, traveled to New Jersey "approximately 2 times in the last 5 years." (*Id.*) Employees of the internal audit and information technology group also visited New Jersey in the past five years, though not on a yearly basis. (*Id.*) While Horton describes the visits as "irregular and sporadic," they add up to at least 20 trips by highly placed corporate officers within the past five years. (Opp'n Br. 13.) The Court takes note of plaintiffs' assertion that despite numerous requests, Horton produced no documents relating to any of these visits, claiming that such documents could not be located. (*Id.*)

The Court agrees with plaintiffs' contention that extensive visits are not even necessary to establish continuous and systematic contacts. To the contrary, "physical presence in the forum

6

is no longer determinative in light of modern commercial business arrangements; rather, mail and wire communications can constitute purposeful contacts when sent into the forum." (Opp'n Br. 14) (quoting *Telecordia Tech. Inc. v. Telkom SA LTD*, 485 F.3d 172, 177 (3d Cir. 2006) (internal citations omitted)).  Indeed, here the evidence shows that communication <u>qua</u> communication is not the point.  Horton is a regular presence *inside* Horton-N.J.:  Horton's CFO has complete access to Horton-N.J.'s books through Horton's accounting software. (Seagraves Tr., 103:10-104:8.)  Horton also requires Horton-N.J. to submit to Horton daily, weekly, monthly, and quarterly accounting information. (Corp. Manual, at DRHI 3258-59, Exh. 6.)  The Court finds that its New Jersey contacts are sufficiently extensive to be classified as "systematic and continuous."

A substantial amount of attention has been given in the briefs to Horton's website (www.drhorton.com), which plaintiffs describe as decidedly interactive but Horton insists is "passive."  The website advertises homes for sale throughout the country, including New Jersey. (*See* Horton website, Exh. 22.)  The website bears Horton's corporate name, logo, and New York Stock Exchange ticker symbol.[1]  (*Id.*)  The website includes a "New Jersey homepage" listing New Jersey properties for sale, provides a New Jersey phone number and mailing address, and urges visitors to "Contact us today!" (*Id.*)  Horton's website allows visitors to e-mail an online sales counselor, search for homes in New Jersey, submit a detailed request for additional information, view floor plans for homes in New Jersey, register with the website to create a list of "favorite" homes, calculate mortgage payments, and complete an online job application.  (*Id.*) The interactive nature of Horton's website is further evidenced in the transcript of Antonio Godinho, a member of plaintiff NJRCC:

---

[1] Among the Horton companies, only Horton is publicly traded; Horton-N.J. is not. (Seagraves Tr. 45:7-9.)

> A big map shows up of [the] United States. I click on New Jersey. On [sic] New Jersey show up different projects that you guys have in New Jersey. And I saw like around Cherry Hill and I obtained directions from my house to that particular site."

(Godinho Tr. 30:12-16.)

In the face of this website's patently interactive capacity, Horton's brief calls it "passive." Its insistence on the characterization most likely arises from Judge McLaughlin's analysis in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), a case that has deservedly become the seminal authority regarding general jurisdiction based upon the operation of an internet website.

> [T]he likelihood that personal jurisdiction can be constitutionally exercised [based upon use of a website] is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than take information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* at 1124.

Horton argues that its website does not sell anything, adding that a visitor cannot purchase a residence through the website. (Moving Br. 19.) Plaintiffs contend that *Zippo Mfg. Co.* supports a finding that Horton's website is interactive, specifically when the court stated that "the middle ground is occupied by interactive Web sites where a user can exchange

8

information with the host computer." (*Id*. 32) (quoting *Zippo Mfg. Co.*, 952 F. Supp. at 1124). The evidence demonstrates that this is precisely what the website offers – an exchange of information and, incidentally, the opportunity for Horton to engage with customers. Horton's argument that its website is passive because a visitor cannot purchase a home through the website is specious; plaintiffs correctly point out that home purchases typically require a large outlay of cash, financing, and the preparation of legal documents, and are not generally made online. (Opp'n Br. 32.)

Moreover, in prior litigation where Horton has been sued in New Jersey, it has not contested personal jurisdiction. (*Id.* 17.) For example, in *Pavich v. D.R. Horton*, No. 06-1893, Horton admitted that it maintained an office in New Jersey. (*Id.*) (*See Pavich v. D.R. Horton* Answer, Exh. 1.) Plaintiffs argue that this Court should exercise personal jurisdiction over Horton as a matter of judicial estoppel, based on its previous admission in *Pavich*. (Opp'n Br. 17.) "Judicial estoppel prevents parties from taking different positions on matters in litigation to gain advantage."[2] (*Id.*) (quoting *Whiting v. Krassner*, 391 F.3d 540, 543 (3d Cir. 2004)). Plaintiffs urge that judicial estoppel is appropriate here because Horton contradicts an admission it made to this Court in prior litigations, and taking such inconsistent positions should not be permitted. (Opp'n Br. 18).

However, Horton argues that courts generally have rejected the argument that a party's appearance in a lawsuit as a plaintiff or defendant acts as a basis to support general personal jurisdiction. (*Id.*) (citing *Jones v. Blige*, 2006 U.S. Dist. LEXIS 29721 at *14 (E.D. Mich. 2006);

---

[2] In determining whether to apply judicial estoppel, relevant factors include whether: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppels is tailored to address the affront to the court's authority or integrity." (Opp'n Br. 17.) (citing *Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 559 (3d Cir. 2002)) (quoting *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001)).

*Merlino v. Harrah's Entertainment, Inc.*, 2006 U.S. Dist. LEXIS 6411 (E.D. Pa. 2006); (*Blackwell v. Marina Assocs.*, 2006 U.S. Dist. LEXIS 9423 (E.D. Pa. 2006)).

In determining whether to apply judicial estoppel, relevant factors include whether: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." (Opp'n Br. 17.) (citing *Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 559 (3d Cir. 2002)) (quoting *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001)).

Rather than introduce yet another avenue of analysis, the Court refrains from applying these factors because it is convinced that there is more than enough information to establish general jurisdiction. The Court remains mindful, however, of Horton's inconsistent statement to another court that it maintained an office in New Jersey, as well as its entirely unpersuasive descriptions of corporate officers' regular visits to New Jersey on business as "episodic" and "sporadic" and its website as "passive." Burdened by such anomalous positions, Horton's arguments naturally weaken.

Ironically, Horton's choice of words to describe its activities vis-à-vis Horton-N.J. does work where it claims that "at best, the company's activities exhibit *normal oversight* by a publicly traded parent company over a subsidiary." (Moving Br. 14) (emphasis added). This is tantamount to an admission when one considers the record, which reveals Horton's systematic

and thorough regulation of Horton-N.J., ranging from insurance policies to payroll, from final approval for all land purchases to income tax filings.[3]

Bearing in mind that "normal oversight" is Horton's term, the Court finds that its regular monitoring and control of activities satisfy the requirements of general jurisdiction.

### B.  Specific Jurisdiction

Horton argues that specific jurisdiction would require its involvement with employees on site at the Garden State Park project, and that such evidence is lacking.  (*See* Moving Br. 34.)  It must be remembered that this lawsuit is about hiring practices.  The evidence demonstrates that: (1) Horton approved Horton-N.J.'s purchase of land on which the Plaza Grande at Garden State Park development was constructed (Seagraves Tr., 170:10-14); (2) Horton funded Horton-N.J.'s purchase of the land on which the Plaza Grande at Garden State Park was constructed (*Id.* at 170:15-17, 28:14-19); (3) Seagraves attended the January 2006 meeting with representatives of plaintiff NJRCC, at which time it was agreed that union carpenters would work on the Garden State Park development (Am. Compl. ¶ 24; Pechmann Aff. ¶ 6); (4) several Horton-N.J. employees attended meetings relating to the Garden State Park development during which they provided business cards bearing the Horton name, logo, and ticker symbol to representatives of Plaintiff NJRCC (Am. Compl. ¶¶ 24-33, Pechmann Aff. ¶¶ 3-8); (5) Horton paid the various contractors working at the Garden State Park development, including defendant Tosa (Checks, Exh. 7); (6) Horton benefits from the revenue generated from sales of units at the Plaza Grande, which was constructed in part by undocumented workers (Seagraves Tr., 72:13-23).

---

[3] The extent of Horton's day-to-day control is set forth below, *see infra* Part C, Parent-Subsidiary Relationship.

Horton contends that the cause of action being litigated "did not arise out of" the foregoing activities. This is semantics, not economic reality, which is closer to plaintiffs' contention that "Horton approved and funded the New Jersey developments at issue and reaped the economic benefits of the use of undocumented workers." (Opp'n Br. 28.) As such, there is sufficient evidence of specific jurisdiction in this record as well.

### C. Parent-Subsidiary Relationship

The parties seem to agree at least that Horton-N.J. was the entity that nominally conducted the in-state activity relevant here. The question, therefore, becomes whether the subsidiary's in-state activity is sufficient to trigger New Jersey's long-arm statute relative to the parent. Put another way, is the *parent's* activity vis-à-vis the New Jersey construction activity adequate to subject it to suit in this state?

The single-entity test allows a court to impute the forum contacts of the subsidiary to the parent when the two entities "are, in reality, operating as a corporate combine." *Greenway Ctr., Inc.*, 2008 U.S. Dist. LEXIS 62666, at *17. The Court is satisfied that Horton's deliberate, strategic marketing of Horton-N.J. as an organ of the parent company strongly indicates the existence of a "single entity."

Horton's branding as "America's Builder" reflects a conscious decision to hold itself out as a nationwide entity. It easily flows from that that Horton seeks to burnish its image by selling the idea that Horton-N.J. and Horton "operat[e] as a corporate combine." *Id.*

Horton-N.J. also uses Horton's name, logo, and ticker symbol on its advertisements for New Jersey homes and press releases.[4] (*See* Exhs. 9, 10.) These press releases tout Horton's

---

[4] For example, a March, 2008 press release advertising a Middlesex County residential development states: "D.R. Horton, a publicly traded company and the nation's largest home builder, builds homes in 27 states and 83

national operations without mentioning Horton-N.J. Plaintiffs argue, and the Court agrees, that Horton and Horton-N.J. market the New Jersey developments in this way to make potential homebuyers believe that the homes advertised are developed and offered for sale by a large national corporation, rather than by a small local company. (*See* Opp'n Br. 8.) Courts deem such a marketing strategy relevant to the jurisdictional analysis. *E.g.*, *Directory Dividends, Inc. v. SBC Communs., Inc.* U.S. Dist. LEXIS 12214, at *15 (E.D. Pa. 2003) (asserting personal jurisdiction where entities employed common marketing scheme to "advance [the] goal of being viewed as a single company serving the nation as a whole rather than several regional companies serving different areas of the country").

Additionally, several New Jersey trade organizations have presented Horton, not Horton-N.J., with awards for marketing activities in New Jersey.[5] (Advertising Awards, Exh. 11.) Horton-N.J. also uses Horton's name, logo, and ticker symbol on business cards, correspondence, and purchase orders. (*See e.g.,* business cards, Exh. 2; Seagraves Tr., 157:14-158:8.) For example, although the employees named on the business cards worked for Horton-N.J., the business cards do not mention Horton-N.J. The following is an excerpt from the deposition of Seagraves:

> Q. Let's go through the cards one by one. Glen McDonald, is he a D.R. Horton, Inc. employee?
> A. No.
> Q. Who is he employed by?
> A. He was employed by D.R. Horton, Inc.-New Jersey.

---

geographic markets across the country and has been heralded for creating the most dynamic of active adult communities, especially in New Jersey." (Press Release, at DRHNJ 8-9, Exh. 10.)

[5] Membership in the 2008 Million Dollar Sales Club as recognized by the Builders League of South Jersey; 2007 Sales & Marketing Awards given to Horton by the Atlantic Builders Convention for various categories including Best Logo Design and Best Signage Program; 2006 Sale & Marketing Awards given to Horton by the New Jersey Builders Association for various categories including Community of the Year and Salesperson of the Year; and 2004 MAME Award given by the Builders League of South Jersey for numerous categories including Best Black and White Logo and Best Signage. (Exh. 11, NJRCC 677-697, 883.)

> Q. Does his business card indicate that he is employed by D.R. Horton, Inc.[-]New Jersey?
> A. No.
> Q. Howard Schoor, is he a D.R. Horton, Inc. employee?
> A. No.
> Q. Who is he employed by?
> A. D.R. Horton, Inc.-New Jersey.
> Q. Does his business card indicate that he is employed by D.R. Horton, Inc.-New Jersey?
> A. No.

(Seagraves Tr., 157:14-158:8.)

Likewise, correspondence with New Jersey contractors regarding New Jersey developments, including communications regarding the Plaza Grande, use the Horton name, logo, and ticker symbol. (Comm. with N.J. Contractors, Exh. 19.) The name, logo and ticker symbol are also used in communications with New Jersey municipalities. (*Id.*) Furthermore, municipalities and state agencies issue permits to Horton, not Horton-N.J. (*Id.*)

This mutuality is evident from the evidence discussed above – the website, company business cards, use of the logo and ticker symbol. In addition, internally, Horton and Horton-N.J. are bound together firmly under the terms of Horton's corporate manual. A review of the manual demonstrates that the parent company is involved in Horton-N.J.'s day-to-day operations, so much so that Horton-N.J. does not and cannot operate independently.

Horton dictates the minute details of Horton-N.J.'s operations through its 700-page corporate manual of policies and procedures. (*See* Corp. Manual.) The corporate manual provides that Horton performs the following functions on behalf of its subsidiaries: "capital allocation, final approval and funding of all land purchases, financing, cash management, risk management, payroll and employee benefits, accounting and financial reporting standards, income tax filing, negotiation and execution of national purchasing agreements, and information

14

technology standards." (*Id.* at DRHNJ 3162.)  For instance, Horton-N.J. had to request corporate approval to purchase the parcel where the underlying dispute occurred. Seagraves granted approval to purchase the parcel and Horton funded the purchase of land.  (Seagraves Tr., 27:16-22.)

Additionally, the corporate manual:  (1) mandates that Horton provide Horton-N.J. payroll services, health insurance, and workers compensation insurance; (2) dictates the minimum workers compensation and liability insurance requirements for Horton-N.J.'s contractors; (3) requires its subsidiaries to "follow the same set of accounting standards and policies"; (4) Horton Region Presidents must certify the accuracy of the financial and operational records for the "Divisions" within their geographic region; (5) provides accounting services and training for Horton-N.J., including on-site training visits; (6) Horton must approve Horton-N.J.'s business plans and budgets, proposed land acquisitions, allocation and oversight of inventory, major personnel decisions, and division president compensation plans; (7) Horton pays for Horton-N.J.'s land purchases; (8) Horton must approve any debt incurred by Horton-N.J.; (9) Horton dictates the liability insurance requirements of Horton-N.J.'s contractors; (10) Horton maintains all employee/human resource files for Horton-NJ's employees; (11) Horton monitors and controls litigation strategy for all lawsuits involving its subsidiaries. (*See* Corp. Manual.) Based on Horton's extensive involvement in the day-to-day operations of Horton-N.J., the Court is more than satisfied that Horton-N.J. cannot and does not operate independently of Horton.

### III.   Conclusion

The Court has conducted an exhaustive review of the evidence and is satisfied that under theories of general and specific jurisdiction, it has personal jurisdiction over Horton.  Moreover,

the evidence reflects that there is a deliberate, targeted identification of Horton with Horton-N.J. sufficient to pierce the corporate veil and subject Horton to the Court's jurisdiction.  Horton's motion is denied.  An appropriate order will be entered.

/s/Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.