**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY REGIONAL COUNCIL OF CARPENTERS; BROOKSIDE CONSTRUCION CORPORATION OF SEWELL, NEW JERSEY; *individually and on behalf of a class*, | |
| Plaintiffs, | |
| v. | Civil Action No. 08-1731 (KSH) |
| D.R. HORTON, INC.; TOSA CONSTRUCTION, INC./N. PAONE CONSTRUCTION, INC., | **OPINION** |
| Defendants. | |

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. Introduction**

      In this labor case, plaintiffs—the New Jersey Regional Council of Carpenters, on behalf of a class, and Brookside Construction Company, Inc.—allege that defendants D.R. Horton, Inc., Horton-New Jersey, and Tosa Construction, Inc., engaged in a scheme to illegally hire undocumented workers, suppress their workers' wages, and avoid paying benefits and taxes. Plaintiff assert that this conduct violated the New Jersey Construction Industry Independent Contractor Act ("NJCIICA") and constituted racketeering activity in violation of the federal and New Jersey Racketeer Influenced and Corrupt Organizations ("RICO") statutes. Now before the Court are defendants' motions to dismiss count one of the amended complaint [D.E. 103] and all of Brookside's claims [D.E. 104].

1

**II. Factual and Procedural History**

For purposes of these motions to dismiss, the complaint's well-pleaded facts are accepted as true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

A. The Parties

*1. Plaintiffs*

The New Jersey Regional Council of Carpenters ("NJRCC") is a labor organization with approximately 17,000 members.  (Am. Compl. ¶ 6.)  Brookside Construction Company, Inc. ("Brookside") is a contractor that performed "rough carpentry" at the Plaza Grande at Garden State Park in Cherry Hill, New Jersey, until April 7, 2006, when defendant D.R. Horton, Inc.-New Jersey ("Horton-N.J.") terminated it and replaced it with defendant Tosa Construction, Inc. ("Tosa"), a non-union contractor.  (*Id.* ¶ 7.)

*2. Defendants*

D.R. Horton, Inc., a Delaware corporation, is the largest homebuilder in the United States.  It employs approximately 6,200 persons and operates in 25 states, including New Jersey, and 74 metropolitan areas.  (*Id.* ¶¶ 8–9.)  On top of conducting its own operations in New Jersey, D.R. Horton has a wholly owned New Jersey subsidiary, Horton-N.J.,[1] which also does business as SGS Communities.  (*Id.* ¶ 9b.)  As noted above, Tosa is a contractor that performed work at the Plaza Grande after Brookside was terminated.  (*Id.* ¶ 10.)  It is the parent company of Sato, Inc., which administered payroll for the work done at the Plaza Grande, and it also does business as N. Paone Construction, Inc.  (*Id.*)

---

[1] Hereinafter, D.R. Horton and Horton-N.J. are collectively referred to as "Horton."

B. An Overview of Horton's Alleged Hiring Scheme

Horton employs thousands of hourly workers on its job sites throughout the country, and to lower labor costs, it and its subcontractors have hired undocumented immigrants who are ineligible for employment in the United States. (*Id.* ¶¶ 13–14.) Horton's regional and corporate offices are responsible for reviewing personnel decisions, establishing internal policies and controls, and monitoring compliance with those policies and controls. (*Id.* ¶ 16.) However, with regard to the hiring scheme, Horton has shifted these responsibilities to subcontractors. (*Id.*) Horton and its subcontractors often do not check for employment documentation and incorrectly classify undocumented workers as independent contractors. (*Id.* ¶ 17.) According to one Horton executive, the company hires undocumented workers because they do not complain about working conditions and do not submit workers' compensation claims; as a result, Horton saves money. (*Id.* ¶ 18.) Plaintiffs allege that this scheme allows Horton to depress wages for all workers and to deny them any bargaining power. (*Id.* ¶ 20.)

C. The Construction at the Plaza Grande

The Plaza Grande is a condominium complex in Cherry Hill, New Jersey, for adults aged fifty-five and older. (*Id.* ¶ 23.) On April 15, 2005, Horton-N.J. contracted with J.J. Deluca to perform construction and act as the general contractor for the project.[2] (*Id.*) Work began in early 2006, and around that time, a member of the NJRCC ("Confidential Witness 1" or "CW1") attended two meetings at Horton's Mount Laurel, New Jersey, office. (*Id.* ¶ 24.) At the first meeting, in January 2006, Horton and its subcontractors agreed to use union labor for the Plaza Grande. (*Id.*)

---

[2] Horton itself assumed the general contractor role in June 2006.

Deluca subcontracted carpentry work on the project to Brookside, from whom it secured a bond as a commitment to complete the work. (*Id.* ¶ 25.) Thereafter, 25 NJRCC members began work at the Plaza Grande for Horton and Brookside. (*Id.*) As work dictated, Brookside from time to time added more NJRCC workers to the job. (*Id.* ¶ 26.) On March 28, 2006, CW1 attended another meeting at Horton's New Jersey office, along with agents of various trade unions and representatives from Horton. (*Id.* ¶ 27.) Al Garfall, the Senior Vice President for Horton's Delaware Valley Division, complained at that meeting about the broad jurisdiction of the NJRCC, which covered general carpentry, drywall and framing work. (*Id.*)

On April 7, 2006, CW1 was called into a meeting at the Plaza Grande with Bill Marma, Horton's project manager. (*Id.* ¶ 28.) Several Horton employees, but no Brookside employees, were there, and Marma said that the union "did not man the job properly," performed "substandard work," and that the workers "were too slow." (*Id.* ¶¶ 29–30.) CW1 countered that the job was manned according to Horton's requests and that the site had passed inspection. (*Id.* ¶ 30.) Garfall then told CW1 he was "trying to get rid of all the union jobs on the site" so he could bring in his own people who would work from "sun up to sundown." (*Id.*) He also said that Horton had "plenty of lawyers and money" and did not care about the NJRCC's "little picket lines and blown-up rats." (*Id.*) He then told CW1 that Brookside was fired and that the workers would report to Tosa and Horton. (*Id.*) Neither Brookside nor Deluca received any prior notice of the termination, nor did they receive any communications from Horton saying Brookside's work was materially deficient. (*Id.* ¶ 36.) CW1 told Garfall that the NJRCC would require fifty percent of the jobs on the site to be filled by union workers, to which Garfall responded by saying Horton and Tosa would only employ two carpenter apprentices. (*Id.* ¶ 31.) He continued by saying "I don't like unions . . . my people pull together to get my jobs done fast. This is just

4

the way we do business.  Now, who do I have to write a check out to to make this all go away."
(*Id.* ¶ 32.)  CW1 refused the offer.  (*Id.* ¶ 33.)

The NJRCC decided to accede to Horton's demand that only two NJRCC members
would remain on site, but CW1 insisted that one be a journeyman carpenter and the other be an
apprentice carpenter; the NJRCC aimed to use the NJRCC members as watchdogs.  (*Id.* ¶¶ 37–
38.)  The journeyman carpenter was Confidential Witness 2 ("CW2"), who had started working
on the site for Brookside on April 6, 2006, and began working for Tosa on April 19, 2006.  (*Id.*
¶¶ 38–39.)  He was actually employed and paid by Sato.  (*Id.* ¶ 39.)  Within a week, Tosa
foreman Steve Young made CW2 a de facto crew supervisor.  (*Id.*)  The NJRCC intended to use
him and the apprentice carpenter as watchdogs.  (*Id.* ¶ 37.)

D. Horton's Use of Undocumented Workers

The complaint alleges that Horton extensively used undocumented laborers during the
construction of the Plaza Grande and on other sites.  CW2, who is fluent in both Portuguese and
Spanish, regularly ate lunch and spoke to Tosa's workers.  (*Id.* ¶ 40.)  Several of them told him
either that they were undocumented or that they had entered the United States illegally by
crossing the Rio Grande.  (*Id.*)  On one particular occasion, on May 19, 2006, CW2 and
Confidential Witness 9 ("CW9") spoke to three workers from Rodriguez Drywall, a Tosa
subcontractor, who all said they were undocumented.  (*Id.* ¶¶ 48, 76.)  Furthermore, on July 20,
2006, workers for SFL Construction, a Tosa subcontractor, told CW2 during a coffee break that
because they were undocumented workers, their lives consisted only of work and sleep, and for
that reason, they planned to leave the United States in "a couple more years."  (*Id.* ¶ 85.)  The
next day, workers from the same subcontractor told CW2 and CW9 that they were
undocumented and had come to the United States from Mexico.  (*Id.* ¶ 86.)  Another worker told

CW2 that he had paid $11,000 in cash to come to the United States from Brazil via Mexico; he said he needed $10,000 more to bring his wife into the country.  (*Id.* ¶ 66.)

Some of the workers who told CW2 they were undocumented also told him they had worked on other Horton sites in New Jersey, including The Grande at Riverdale in Morris County.  (*Id.* ¶ 4.2)  Indeed, the undocumented workers at the Plaza Grande were frequently rotated among the subcontractors working at the Plaza Grande site, as well as to other Horton job sites in New Jersey.  (*Id.* ¶ 71.)  In July 2006, subcontractor RSO Construction hired undocumented workers who had previously worked on the Plaza Grande for MM Carpentry. (*Id.*)  According to CW2, the principal of RSO Construction was himself an undocumented worker.  (*Id.*)

The complaint includes other circumstantial references to the hiring of undocumented workers.  On May 1, 2006, immigrants' rights groups organized "A Day Without Immigrants" ("Un Día Sin Immigrantes"), a day in which undocumented workers skipped work to protest the treatment of immigrants.  (*Id.* ¶ 43.)  On that day, CW2 noted, only he, Young, and CW9 were present and working at the Plaza Grande construction site.  (*Id.*)  In addition, CW2 and Confidential Witness 3 ("CW3") often saw passenger vans with out-of-state plates drop off workers for Horton's subcontractors at the Plaza Grande.  (*Id.* ¶ 44.)  On June 20, 2006, Young told CW2 and CW9 that he was bringing in "twenty really good Brazilian framers" to work at the Plaza Grande.  (*Id.* ¶ 62.)  On July 19, 2006, six members of the SFL work crew were sent home by a Horton supervisor because they could not speak English and therefore could not communicate with the supervisor.  (*Id.* ¶ 87.)

In addition, several undocumented workers served as confidential witnesses for this action.  Confidential Witnesses 4 and 5 ("CW4" and "CW5") worked for Tosa subcontractor

MM Carpentry at the Plaza Grande.  (*Id.* ¶ 64.)  They were hired in the spring of 2006, and their

hours are reflected on Plaza Grande timesheets.  (*Id.*)  Confidential Witnesses 6, 7, and 8

("CW6," "CW7," and "CW8") are also undocumented workers; they worked for Rodriguez

Drywall.  (*Id.* ¶ 76.)

        E. The Workers' Pay and Benefits

        The complaint alleges that Horton and its subcontractors paid the undocumented workers

well below the going rate for union workers and failed to provide them certain required benefits.

For example, some of the undocumented workers told CW2 they were paid $12–$15 per hour

and were not paid overtime.  (*Id.* ¶ 40.)  Three of the workers from Rodriguez Drywall told CW2

and CW9 that they were paid $14 per hour in cash, and according to CW4 and CW5, MM

Carpentry paid its workers $16 per hour, whereas the maximum union carpenter rate was $54 per

hour.  (*Id.* ¶¶ 48, 65.)  In addition, CW4 and CW5 worked nine to ten hour days, six days a week

without overtime pay.  (*Id.* ¶ 65.)  Another MM Carpentry worker stated that he was paid $17 per

hour and that other MM workers earned as little as $8 per hour.  (*Id.* ¶ 66.)  Furthermore, CW6,

CW7, and CW8 stated that Rodriguez Drywall paid them $15 per hour and that they were not

paid overtime.  (*Id.* ¶ 76.)  Another Rodriguez Drywall worker stated that he earned $14 per

hour, with the potential to earn more if he brought his own tools to work.  (*Id.* ¶ 77.)  On July 6,

2006, workers for SFL Construction told CW2 they were paid $14 per hour, worked ten to

eleven hours per day, and were not paid overtime.  (*Id.* ¶ 85.)  Later, on July 21, 2006, a Horton

supervisor told a worker for MPT Contractors "we don't pay for overtime."  (*Id.* ¶ 88.)

        The complaint also alleges that Horton's payment of lower wages impacted union

workers.  On May 26, 2006, Young asked CW2 and CW9 if they would work overtime on a

Saturday and receive cash in exchange for not reporting the work to their union.  (*Id.* ¶ 50.)  On

June 13, the Deluca foreman asked them if they had worked the previous Saturday and reminded

them that Horton would not pay them overtime.  (*Id.* ¶ 57.)  Subsequently, on June 19, 2006,

Young gave CW2 $50 in cash for the Saturday work he had done, despite the fact that he

previously said he would pay $200.  (*Id.* ¶ 59.)  When CW2 complained, Young said he would

give him more cash later.  (*Id.*)

### F. Paperwork (or Lack Thereof)

Numerous allegations in the complaint relate to how Horton created a paper trail between

itself and the undocumented workers, as well as attempts Horton made to avoid doing so.  CW3,

a Horton supervisor on the Plaza Grande, witnessed cash payments to workers for MM

Carpentry and Rodriguez Drywall.  (*Id.* ¶ 44.)  He also stated that Tosa and its subcontractors

regularly gave undocumented workers federal tax forms 1099, which are used to report income

earned by independent contractors, despite the fact that the workers were undocumented and

were not independent contractors.  (*Id.* ¶ 45.)

As of May 18, 2006, no system existed to track the hours worked by the subcontractors'

workers, and the Deluca foreman wanted to create one.  (*Id.* ¶ 47.)  CW2 suggested to Young

that they use sign-in sheets, and the workers began using them the next day.  (*Id.*)  On June 15,

Young told CW2 to add a fictitious name to the sign-in sheet so that Young could charge

additional labor costs to Horton; CW2 used the name "Clavo Torto" ("crooked nail" in English)

to flag the fact that it was fictitious.  (*Id.* ¶ 58.)  The name appeared on ten separate invoices in

June and July 2006.  (*Id.*)

Tosa, Horton, and the subcontractors devised various methods of paying the

undocumented workers.  For example, according to CW4 and CW5, Nick Paone (a named

principal of Tosa) and Steve Ritrovato (a high-level Tosa employee) gave each of the workers a

8

check that they would sign and return. (*Id.* ¶¶ 68–69)  Paone and Ritrovato would then give the workers cash, minus a two percent check-cashing fee. (*Id.* ¶ 69.)  No payroll, Social Security, or income taxes were withheld. (*Id.*)  In addition, CW6, CW7, and CW8 reported that Jose Rodriguez, the principal of Rodriguez Drywall, asked them if any of them had a bank account. (*Id.* ¶ 78.)  None of them did, but CW6's girlfriend had one, so Rodriguez made checks out to the girlfriend and CW6 distributed cash to his coworkers. (*Id.*)  Rodriguez gave CW6 a check for $2,000 on June 28, 2006, from which no payroll, Social Security, or unemployment taxes were withheld. (*Id.* ¶ 79.)  On July 3, 2006, Rodriguez gave CW6 another check from which no taxes were withheld, but this time, the girlfriend's bank returned the check for insufficient funds. (*Id.* ¶ 80.)  CW7's wife attempted to cash the check, but her bank rejected it, too. (*Id.*)

In January 2007, Rodriguez Drywall sent CW6's girlfriend a Form 1099 indicating that the company had paid her $20,000, despite the fact that she never worked a day for the company. (*Id.* ¶ 84.)  In addition, CW6 stated that the first $2,000 check and the check that was rejected by the bank were the only checks or money he and his girlfriend ever received from Tosa. (*Id.*)

G. Failure to Pay Workers

On several occasions, Horton, Tosa, and their subcontractors failed to pay their workers. On June 3, 2006, MM Carpentry's principal told CW2 that Tosa owed him $34,189 for work performed at the Plaza Grande, and that he had been waiting for three months for $5,209 Tosa owed him for work performed at The Grande at Riverdale. (*Id.* ¶ 53.)  In addition, the principal of subcontractor RSO Construction complained to Tosa and Horton that Tosa had failed to pay for work it completed. (*Id.* ¶ 72.)  The RSO principal met with his undocumented workers, including CW4 and CW5, and they collectively agreed to leave the work site on August 30, 2006, because of Tosa and Horton's nonpayment. (*Id.* ¶ 73.)  Some of the undocumented

workers later sued Tosa, N. Paone Framing, and Ritrovato for more than $5,000 in unpaid wages. (*Id.* ¶ 74.)

On July 1, 2006, the principal of subcontractor 5th Generation told CW2 that Tosa had failed to pay him $19,000 for work performed at the Plaza Grande. (*Id.* ¶ 89.) He added that Tosa gave him a check for $2,000 that had been rejected twice by the bank. (*Id.*) Six days later, the 5th Generation principal came to the Plaza Grande to inform that Horton supervisor that Tosa had failed to pay him. (*Id.* ¶ 90.) Also, as noted above, a check Rodriguez Drywall gave to its undocumented workers was also rejected by the bank. (*Id.* ¶ 80.)

H. Other Work Sites

As previously alluded to, Horton and Tosa's practices extended to other work sites in New Jersey. Some of the same subcontractors that worked at the Plaza Grande performed work on other sites. (*Id.* ¶ 54.) For example, MM Carpentry and SFL Contractors both worked at The Grande at Riverdale, and the principal of MM Carpentry stated that Tosa owed him money for work performed at both the Plaza Grande and The Grande at Riverdale. (*Id.* ¶¶ 53–54.) Some of the undocumented workers confirmed that they worked on other Horton sites. (*Id.* ¶¶ 42, 71.) In addition. The complaint also alleges that Horton's practice of hiring undocumented workers extended to The Grande at Summerhill in Delran, New Jersey. (95)

I. Horton's Knowledge

The complaint alleges that Horton was well aware of the circumstances detailed above. Horton employees approved timesheets for workers at the Plaza Grande, including Tosa's subcontractors' workers. (*Id.* ¶ 91.) On July 28, 2006, CW2 personally witnessed a Horton supervisor checking invoices from the subcontractors, and according to CW2, once the supervisor reviewed the invoices and timesheets, Horton Senior Project Manager Zack Colburn

10

would give final approval to pay the invoices.  (*Id.* ¶ 92.)  CW3, who worked for Horton as a supervisor, confirmed that Horton employees approved the subcontractors' invoices for payment and stated that payment flowed, by check, from Horton to Tosa and then from Tosa to its subcontractors and laborers.  (*Id.* ¶¶ 44, 47, 93–94)  One invoice from Tosa to Hilton for carpentry labor, which was dated June 5, 2006, showed that Tosa charged a flat rate for each worker per hour and did not list overtime compensation despite the fact that it detailed overtime hours that Tosa subcontractor crews had worked.  (*Id.* ¶ 55.)  The complaint alleges that Horton's review of invoices put it on notice that even though it was not paying overtime, subcontractor crews were nevertheless working overtime.  (*Id.* ¶ 56.)

The complaint also alleges that Young and other Horton employees on site knew or must have known that the company used undocumented laborers and failed to adequately pay workers. When Young asked CW2 and CW9 if they would work for cash on a Saturday, they responded that they would do it as long as Young guaranteed that Horton knew of the arrangement.  (*Id.* ¶ 50–51.)  Young told CW2 and CW9 to speak to the on-site Horton supervisor; they did, and the supervisor said to them, "If you guys don't tell, I won't tell."  (*Id.*)  On June 1, 2006, Young told CW2 and CW9 that in order to pay them cash, he would put them on the Rodriguez Drywall payroll and then "get cash for them."  (*Id.* ¶ 52.)  Furthermore, Young served as the primary supervisor of the undocumented workers, first under Deluca and then under Horton once it assumed general contractor duties and took on a more hands-on role.  (*Id.* ¶¶ 61, 67.)  He also oversaw MM Carpentry's work.  (*Id.*)  Also, CW2, CW4, and CW5 stated that Young convinced some undocumented workers to rent an apartment in Cherry Hill, withdrew cash to give them for a deposit, and later lived there with the undocumented workers, rent-free.  (*Id.*)  In addition, on May 24, 2006, a Horton quality control supervisor visited the Plaza Grande and spoke to CW2

and CW9, all while workers from MM Carpentry and Rodriguez—which are both alleged to have employed undocumented laborers—were working on the site.  (*Id.* ¶ 49.)

Through his role as a Horton supervisor on the Plaza Grande, CW3 gained knowledge of the use of undocumented workers and how they were treated and paid.  CW3 told CW2 and CW9 on June 19, 2006, that he knew workers had put in overtime at the Plaza Grande the previous Saturday.  (*Id.* ¶ 60/)  In addition, some undocumented laborers who worked for MM Carpentry complained to CW3 that they had not been paid, and he advocated on their behalf with his Horton superiors.  (*Id.* ¶ 70.)  CW3 also was aware that the principal of RSO Construction complained to representatives from Tosa and Horton that Tosa was not paying his workers.  (*Id.* ¶ 72.)

The complaint alleges that Horton knew about other payment issues.  On July 5, 2006, CW6 told Young—through CW9 acting as interpreter—that Rodriguez Drywall had not paid his crew's wages.  (*Id.* ¶ 81.)  Occasionally, the Rodriguez crew protested the failure to pay them by showing up at the job site but refusing to work.  (*Id.* ¶ 82.)  On July 17, 2006, CW2 witnessed a Horton supervisor ask the Rodriguez workers why they were not working, and the workers responded that Tosa had not paid them in three to four weeks.  (*Id.*)  Although they had not been paid, the workers—including CW6, CW7, and CW8—returned to work and asked CW3 to help them get their unpaid wages.  (*Id.* ¶ 83.)  CW3 told them not to do anything, and they left the Plaza Grande work site in late July 2006 because they still had not been paid.  (*Id.*)  As noted above, the principal of 5th Generation also complained to the Horton supervisor that Tosa had not paid him for work performed at the Plaza Grande.  (*Id.* ¶ 89.)

12

J. Procedural History

The NJRCC and Brookside filed their initial complaint in New Jersey state court on March 19, 2008, alleging violations of the federal RICO statute, 18 U.S.C. § 1961 *et seq.*, the New Jersey RICO statute, N.J.S.A. § 2C:41-1 *et seq.*, and the NJCIICA, N.J.S.A. § 34:20-1 *et seq.* [D.E. 1.] Defendants removed to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446, on the grounds that plaintiffs' claims raised a federal question under 28 U.S.C. § 1331. After the parties conducted limited discovery on the issue of jurisdiction, plaintiffs filed an amended complaint, which added certain jurisdictional allegations and made various other revisions. [D.E. 57.] The substantive allegations remained the same, however: the NJRCC brought claims under the federal and New Jersey RICO statutes and the NJCIICA on behalf of a class of workers whose wages were depressed due to Horton's hiring scheme, and Brookside joined in the NJRCC's RICO claims while adding factual allegations of its own. D.R. Horton filed a motion for summary judgment, arguing that this Court lacked personal jurisdiction over it. [D.E. 58.] The Court denied the motion in a written opinion [D.E. 82, 83], and also denied D.R. Horton's motion to amend its previous order to certify the issue of personal jurisdiction for interlocutory appeal [D.E. 109, 110]. Now before the Court are Horton's motions to dismiss for failure to state a claim upon which relief can be granted.

**III. Motion to Dismiss Standard**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) may be granted only if, accepting all well-pleaded facts in the complaint as true and viewing them in the light most favorable to the non-moving party, the court finds that the complaint alleges a claim that is plausible on its face. *Fowler*, 578 F.3d at 210–11. The inquiry consists of two parts: First, the court must separate the factual and legal elements of a claim and disregard any legal conclusions. *Id.* Second, the court

13

must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)). The alleged right to relief must rise above the level of speculation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 219 S. Ct. at 1950. Nevertheless, the court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 110–111 (3d Cir. 2002).

## IV. Plaintiffs' RICO Claims

Turning first to plaintiffs' federal claims, plaintiffs allege that, in violation of the federal RICO statute, defendants and their subcontractors constituted an enterprise that they conducted through a pattern of racketeering activity. (Am. Compl. ¶ 135.) They allege that defendants engaged in racketeering activity by committing several violations of the Immigration and Nationality Act, including employing, harboring, and transporting undocumented workers and encouraging them to remain in the United States. (*Id.* ¶¶ 116–122.) They also allege that defendants accepted and used false identification documents provided to them by the workers, and that they committed wire fraud when they sent invoices for labor costs that included wages for the undocumented workers. (*Id.* ¶¶ 123–134.) Plaintiffs further allege that defendants conspired to conduct their RICO enterprise. (*Id.* ¶¶ 177–191.) The two plaintiffs assert that defendants' RICO enterprise harmed them in slightly different ways. The NJRCC, on behalf of the class, alleges that defendants profited by depressing the class members' wages, while Brookside alleges that because it refused to use undocumented laborers, Horton fired it from the work site at the Plaza Grande. (*Id.* ¶¶ 156–176.) Brookside also contends that the use of

14

undocumented laborers by Horton, Tosa, and their subcontractors hindered Brookside's ability to compete for jobs.  (*Id.* ¶ 164.)

The federal Racketeer Influenced and Corrupt Organizations (RICO) Act provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962.  "Any person injured in his business or property by reason of a violation of [§] 1962 may sue therefor in any appropriate United States district court."  18 U.S.C. § 1964(c).  To state a civil RICO claim, a plaintiff must allege the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

A person includes "any individual or entity capable of holding a legal or beneficial interest in property," and an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(3)–(4).  A "'pattern of racketeering activity' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  The RICO statute sets forth a listing of predicate offenses, which include wire fraud, 18 U.S.C. § 1343, violations of Section 274 of the Immigration and Nationality Act, 8 U.S.C. § 1324(a), and knowingly using false immigration documents, 18 U.S.C. § 1546.  18 U.S.C. § 1961(1).

One of the requirements of pleading a RICO claim under 18 U.S.C. § 1962(c) is that the plaintiffs must allege "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner*

*Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  The Supreme Court "has said that liability 'depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs.'"  *Id.* at 163 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).  In a recent case from this District in which Wal-Mart and several of its contractors were accused of violating immigration laws and exploiting the undocumented workers they hired, Judge Greenaway issued two thoughtful opinions, the second of which probed the "distinctness" requirement.  *See Zavala v. Wal-Mart Stores, Inc.* (*Zavala II*), 447 F. Supp. 2d 379 (D.N.J. 2006).  Applying *Kushner*, Judge Greenaway observed that the plaintiffs alleged both that Wal-Mart and its contractors were persons within the meaning of RICO and that Wal-Mart and its contractors together constituted the RICO enterprise.  *Id.* at 382–83.  He held that "[b]ecause both Wal-Mart and the contractors engaged in the racketeering activity, and also constitute the enterprise, the RICO person and the RICO enterprise are identical."  *Id* at 383.

The allegations in the amended complaint in this case are nearly identical.  Plaintiffs allege that "Horton, Tosa, and the subcontractors who undertook work on Horton sites throughout New Jersey . . . . constituted an association-in-fact 'enterprise' within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c)."  (Am. Compl. ¶ 135.)  However, they also allege that "Horton, Tosa, and their subcontractors engaged in racketeering activity within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above, and in particular, in Paragraphs 1 through 95 above," and that "Horton and Tosa, 'persons' within the meaning of RICO, have committed a pattern of racketeering activity . . . since at least 2006."  (*Id.* ¶¶ 138, 143.)  The detailed allegations of paragraphs 13–95 of the amended complaint—recounted above—illustrate that the "persons" who engaged in the alleged predicate acts are Horton, Tosa, and their subcontractors.  (Am. Compl. ¶¶ 13–95.)  Pursuant to the distinctness requirement, Horton, Tosa,

16

and the subcontractors cannot also constitute the enterprise.  *See Zavala II*, 447 F. Supp. 2d at

383.  Therefore, plaintiffs have failed to adequately plead a RICO violation; and count two of the

amended complaint must be dismissed for failure to state claim upon which relief can be granted.

Because count two is inadequately pleaded, count three—alleging, pursuant to 18 U.S.C. §

1962(d), a conspiracy to violate 18 U.S.C. § 1962(c)—must also be dismissed.  *See Lightning*

*Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d)

based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the

substantive claims are themselves deficient.").

Because no amendment could cure the failure to allege RICO persons distinct from the

RICO enterprise, granting leave to amend plaintiffs' federal RICO claims would be unavailing.

*See Zavala II*, 447 F. Supp. 2d at 383–84.  Therefore, the federal RICO claims alleged in counts

two and three of the amended complaint must be dismissed with prejudice.

Furthermore, the Court is mindful that defendants' notice of motion sought to dismiss

only Brookside's RICO claims and did not reference the NJRCC's RICO claims.  However, a

"district court may on its own initiative enter an order dismissing the action provided that the

complaint affords a sufficient basis for the court's action."  *Bryson v. Brand Insulations, Inc.*,

621 F.2d 556, 559 (3d Cir. 1980).  There is a sufficient basis for dismissing the RICO claims in

their entirety, as both plaintiffs have alleged the same deficient RICO claims.  They have alleged

that they suffered two slightly different harms, but their claims are intertwined insofar as they

allege that they were both harmed as a result of the same conduct.  It is the allegations of

defendants' conduct that fail to pass the threshold of a motion to dismiss, and therefore, both the

NJRCC's and Brookside's federal RICO claims must be dismissed.

## V. Plaintiffs' NJCIICA and New Jersey RICO Claims

Having dismissed plaintiffs' federal RICO claims, the only claims remaining are plaintiffs' state RICO claims[3] and their claim under the NJCIICA.  This Court, however, lacks subject matter jurisdiction over those claims.

First, although plaintiffs contend that the predicate acts engaged in by defendants include violations of federal law—to wit, violations of the Immigration and Nationality Act, 8 U.S.C. § 1324(a); wire fraud, 18 U.S.C § 1343; and knowingly using false immigration documents, 18 U.S.C. § 1546—a federal court does not have jurisdiction over state RICO claims simply because they are based on predicate acts that include violations of federal law.  *See Horowitz v. Marlton Oncology, P.C.*, 116 F. Supp. 2d 551, 556 (D.N.J. 1999) (Simandle, J.).  A federal court has subject matter jurisdiction over any claim "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and in the context of state law claims that invoke federal law, a federal court will have jurisdiction over such claims if they "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  In *Horowitz*, Judge Simandle held that the District Court did not have subject matter jurisdiction where the plaintiff alleged that defendants' violations of federal law constituted predicate acts under the New Jersey RICO statute because none of the federal laws invoked provided a private right of action.  *Id.* at 554–55.  Presaging *Grable*, Judge Simandle stated that "[i]f the plaintiff

---

[3] The New Jersey RICO statute has no distinctness requirement, and thus plaintiffs' state RICO claims cannot be dismissed on those grounds.  *See Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J. Super. 84, 95–96 (App. Div. 1993) ("The Appellate Division in [*State v. Ball and Big Apple Leasing Co.*, 268 N.J. Super. 72 (App. Div. 1993)] makes it clear that the broader definition of "person" under New Jersey RICO eliminates the Enright distinctiveness rule for an action under N.J.S.A. 2C:41-2c, the comparable state statute to 18 U.S.C.A. § 1962(c).").

could not have sued directly under the federal statute itself, then allowing federal jurisdiction for

a state claim because that state claim is predicated on an alleged violation of that federal law

would flout congressional intent and the implied congressional conclusion that the claimed

violation is 'insufficiently substantial to confer federal-question jurisdiction.'"  *Id.* at 555

(quoting *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 814 (1986)).  As Judge

Simandle noted in *Horowitz*, the federal wire fraud statute does not provide a private right of

action.  *Id.*  Nor do 8 U.S.C. § 1324 or 18 U.S.C. § 1546, both of which are criminal statutes.

*See Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86–87 (2d Cir. 1972) (stating

that, as a general rule, private parties lack the authority to enforce criminal statutes); *see also*

*Three Rivers Ctr. for Ind. Living v. Hous. Auth.*, 382 F.3d 412, 420 (3d Cir. 2004) ("A court must

look to the text of the statute to see if it states, by its terms, that a private party may bring suit to

enforce it.").  Plaintiffs' New Jersey RICO claims, therefore, do not "arise under" federal law,

and this Court lacks federal question jurisdiction.

Second, having reviewed the docket, the Court observes that the parties are not

completely diverse.  All plaintiffs are citizens of New Jersey (Am. Compl. ¶¶ 6–7), and so is

Horton-N.J. (*See* Mot. for Summ. J., Statement of Material Facts [D.E. 58-1], ¶ 30).  Therefore,

the Court does not have diversity jurisdiction under 28 U.S.C. § 1332.  Indeed, defendants

removed solely on the basis of federal question jurisdiction.  [D.E. 14.]  Furthermore, the Court

declines to exercise supplemental jurisdiction over plaintiffs' state law claims, in significant part

because it appears no New Jersey court has yet opined on the interpretation or application of the

NJCIICA.  *See* 28 U.S.C. § 1367(c).  Therefore, plaintiffs' state law claims are remanded to state

court.

**VI. Conclusion**

For the foregoing reasons, plaintiffs' federal RICO claims are dismissed with prejudice and the case is remanded to state court.  An appropriate order will be entered.


/s/ Katharine S. Hayden

September 27, 2011                                    Katharine S. Hayden, U.S.D.J.

20